Daniel LENN, etc., et al.,
Plaintiffs, Appellants,

v.

PORTLAND SCHOOL COMMITTEE,
et al., Defendants, Appellees.

No. 93–1123.

United States Court of Appeals,
First Circuit.

Heard June 8, 1993.

Decided July 15, 1993.

Richard L. O'Meara, with whom Murray, Plumb & Murray, Portland, ME, was on brief, for plaintiffs, appellants.

Eric R. Herlan, Portland, ME, with whom Peter H. Stewart, Asst. Atty. Gen., Augusta, ME, and Drummond Woodsum Plimpton & MacMahon, Portland, ME, were on consolidated brief, for defendants, appellees.

Before TORRUELLA, SELYA and BOUDIN, Circuit Judges.

SELYA, Circuit Judge.

This appeal features a controversy between the parents of a handicapped child and a local school committee. Despite the parents' protests, a state hearing officer declared the school committee's 1991–92 individualized education program (IEP) appropriate for the child's needs and in compliance with federal law. The United States District Court for the District of Maine upheld the finding. We affirm.

## I. BACKGROUND

Daniel Lenn, a minor, is handicapped within the meaning of the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400–1485 (1988 & Supp.III 1991).[1] Daniel has a severe, non-verbal learning disability connected with the brain's right hemisphere. While his verbal IQ test scores are average to low average, Daniel has difficulty interpreting non-verbal messages, such as facial cues. He has a short attention span, lacks the ability to intake, process, or retrieve information in an organized way, possesses poor visual memory, often misperceives the world around him, and pays excessive attention to small details. His disability inhibits social interaction with peers and impedes academic progress.

Daniel attended the Portland, Maine public schools as a special education student through the eighth grade. While he advanced from year to year, his attainments fell steadily behind those of his peers. His progress slowed to a crawl during the 1989–90 and 1990–91 school years. By July 1991, Daniel had completed the eighth grade; nevertheless, his reading and mathematical calculation scores were at roughly a sixth-grade level and his score in applied mathematics was at a second-grade level.

Daniel's eighth-grade year (1990–91) was interrupted by a one-month midwinter hospital stay, during which treating professionals illuminated the nature and extent of his cognitive disability. That July, Daniel's parents placed him in a summer program at Eagle Hill, a private school in Massachusetts. They also contacted the Cleveland Clinic and arranged to have Daniel undergo a series of additional educational, neurological, and psychological examinations. Relying in part on the new information generated through the Lenns' efforts, the Portland School Committee (Portland) shifted gears, scrapped several of its earlier (unsuccessful) approaches, and proposed an IEP for Daniel's ninth-grade education that contained several innovations. Nevertheless, Daniel's parents rejected the public-school-based program, unilaterally enrolled Daniel as a full-time residential student at Eagle Hill,[2] and requested a hearing on the IEP's adequacy.

After pondering testimony from eighteen witnesses and reviewing numerous exhibits, the state hearing officer concluded that Portland's IEP for the 1991–92 school year was "reasonably calculated to be of significant educational benefit in an environment which is much less restrictive than Eagle Hill." Accordingly, he rejected the Lenns' remonstrance. The federal district court upheld the agency determination. This appeal ensued.[3]

## II. STATUTORY OVERVIEW

We start our substantive discussion by parsing the statutory scheme and describing how, and to what extent, parents or guardians displeased by a school board's response to a child's handicap may seek judicial review of an IEP.

---

1. In their complaint, the plaintiffs also invoke section 504 of the Rehabilitation Act, 29 U.S.C. § 794 (1988). Concluding that the sweep of the two statutes is identical for purposes of this case, the parties have briefed and argued their points solely with reference to the IDEA. We assume *arguendo* that the parties' assessment is accurate. Hence, we analyze the assigned errors under the IDEA.

2. Daniel is still in residence at Eagle Hill, albeit at considerable expense to the Lenns.

3. Daniel Lenn and his parents, Stephen and Eileen Lenn, plaintiffs below, are appellants in this court. Portland and the Maine Department of Education, defendants below, appear as appellees. In view of the community of interest between the school committee and the state agency, we treat the appeal as if Portland were the sole appellee.

## A

■ To qualify for federal funding under the IDEA, a state must offer "all children with disabilities ... a free appropriate public education." 20 U.S.C. §§ 1400(c), 1412(1). In this context, appropriateness requires that the instructional plan be custom tailored to address the handicapped child's "unique needs," 20 U.S.C. § 1400(c), in a way "reasonably calculated to enable the child to receive educational benefits." *Board of Educ. v. Rowley,* 458 U.S. 176, 207, 102 S.Ct. 3034, 3051, 73 L.Ed.2d 690 (1982); *accord Amann v. Stow Sch. Sys.,* 982 F.2d 644, 647 (1st Cir.1992); *Roland M. v. Concord Sch. Comm.,* 910 F.2d 983, 987 (1st Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1122, 113 L.Ed.2d 230 (1991). Because the IEP—a written document detailing the student's current educational level, the short-term and long-term goals of the educational plan, the specific services to be offered (including transition services), and a set of objective criteria for subsequent evaluation, *see* 20 U.S.C. § 1401(a)(20); 34 C.F.R. § 300.346 (1992)—comprises the centerpiece of a state's IDEA-compelled response to a particular child's handicap, the critical inquiry in a case of this genre is "whether a proposed IEP is adequate and appropriate for a particular child at a given point in time." *Burlington v. Department of Educ.,* 736 F.2d 773, 788 (1st Cir.1984), *aff'd,* 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985).

The IDEA does not promise perfect solutions to the vexing problems posed by the existence of learning disabilities in children and adolescents. The Act sets more modest goals: it emphasizes an appropriate, rather than an ideal, education; it requires an adequate, rather than an optimal, IEP. Appropriateness and adequacy are terms of moderation. It follows that, although an IEP must afford some educational benefit to the handicapped child, the benefit conferred need not reach the highest attainable level or even the level needed to maximize the child's potential. *See Rowley,* 458 U.S. at 198, 102 S.Ct. at 3046–47; *Roland M.,* 910 F.2d at 992.

■ The IDEA also articulates a preference for mainstreaming. *See* 20 U.S.C. § 1412(5) (requiring states to educate handicapped and non-handicapped children together "to the maximum extent appropriate"). Translated into practical application, this preference signifies that a student "who would make educational progress in a day program" is not entitled to a residential placement even if the latter "would more nearly enable the child to reach his or her full potential." *Abrahamson v. Hershman,* 701 F.2d 223, 227 (1st Cir.1983); *accord Hampton Sch. Dist. v. Dobrowolski,* 976 F.2d 48, 52 (1st Cir.1992). And, moreover, when the bias in favor of mainstreaming is married to the concepts of appropriateness and adequacy, it becomes apparent that an IEP which places a pupil in a regular public school program will ordinarily pass academic muster as long as it is "reasonably calculated to enable the child to achieve passing marks and advance from grade to grade." *Rowley,* 458 U.S. at 204, 102 S.Ct. at 3049.

## B

■ A parent or guardian may challenge an IEP's adequacy by demanding a due process hearing before the state educational agency. *See* 20 U.S.C. §§ 1415(b)(2), 1415(c). If the agency approves the IEP, the parent or guardian may seek further review in either state or federal court. *See id.* at § 1415(e)(2). The relevant statutory provision requires the forum court to mull the administrative record, take additional evidence under certain circumstances, and "base[ ] its decision on the preponderance of the evidence." *Id.* While the IDEA envisions judicial review, the statute "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley,* 458 U.S. at 206, 102 S.Ct. at 3051. Rather, the law contemplates an intermediate standard of review on the trial-court level—a standard which, because it is characterized by independence of judgment, requires a more critical appraisal of the agency determination than clear-error review entails, but which, nevertheless, falls well short of complete *de novo* review. *See Roland M.,* 910 F.2d at 989; *Colin K. v. Schmidt,* 715 F.2d 1, 5 (1st Cir.1983).

In the course of this independent review, the administrative proceedings must be accorded "due weight." *Rowley*, 458 U:S. at 206, 102 S.Ct. at 3051; *see also Colin K.*, 715 F.2d at 5. Although the exact quantum of weight is subject to the district judge's exercise of informed discretion, *see Hampton*, 976 F.2d at 52; *G.D. v. Westmoreland Sch. Dist.*, 930 F.2d 942, 946 (1st Cir.1991), the judge is not at liberty either to turn a blind eye to administrative findings or to discard them without sound reason. *See Burlington*, 736 F.2d at 792 ("The court, in recognition of the expertise of the administrative agency, must consider the findings carefully and endeavor to respond to the hearing officer's resolution of each material issue."). In the end, the judicial function at the trial-court level is "one of involved oversight," *Roland M.*, 910 F.2d at 989; and in the course of that oversight, the persuasiveness of a particular administrative finding, or the lack thereof, is likely to tell the tale.

### C

■ Determining the adequacy of an IEP is a fact-intensive exercise. Consistent with this verity, the governing standard for appellate review in an IDEA case is firmly settled:

> [I]n the absence of a mistake of law, the court of appeals should accept a district court's resolution of questions anent adequacy and appropriateness of an IEP so long as the court's conclusions are not clearly erroneous on the record as a whole.

*Id.* at 990–91. The clear-error hurdle is, of course, quite high. *See, e.g., Cumpiano v. Banco Santander Puerto Rico*, 902 F.2d 148, 152 (1st Cir.1990) (holding that, under a regime of clear-error review, an appellate court "ought not to upset findings of fact or conclusions drawn therefrom unless, on the whole of the record, [the appellate judges] form a, strong, unyielding belief that a mistake has been made"). Even in precincts where the clearly erroneous standard obtains, however, a trial court's rulings of law are reviewed *de novo*. *See LeBlanc v. B.G.T. Corp.*, 992 F.2d 394, 396 (1st Cir.1993); *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 972 F.2d 453, 457 (1st Cir.1992).

### III. CLAIMED ERRORS OF LAW

In an effort to sidestep clear-error review and take shelter in the lee of a more accommodating standard, the Lenns attribute two errors of law to the court below. They contend that the court (1) applied the wrong legal yardstick in taking the measure of the hearing officer's findings; and (2) failed sufficiently to address each of Daniel's identified educational needs in determining the adequacy of Portland's proposed IEP. We discuss these contentions *seriatim*.

### A

■ Appellants' flagship claim is that the lower court affirmed the hearing officer's decision without conducting the independent evidentiary review that the IDEA requires. The claim founders: the record below contains all the earmarks of a suitably deferential, yet suitably independent, judicial inquiry.

The linchpin of this conclusion is the district court's opinion. In it, Judge Brody explains a reviewing court's duty, canvasses the pertinent authorities, and acknowledges the relationship between the hearing officer's findings and the district court's oversight function, concluding that "while [the district] court must make an independent ruling, [its] review must be something short of *de novo*." *Lenn v. Portland Sch. Comm.*, No. 92–0011–P–H, slip op. at 6, 1992 WL 510895 (D.Me. Dec. 14, 1992) (D.Ct.Op.). The court's discussion could hardly be more pointed or more accurate.

■ In the face of this pellucid prose, appellants have an uphill battle. They argue that, although the district judge gave lip service to the correct standard, he actually viewed the evidence through a much more deferential glass. We recognize that actions sometimes speak louder than words. Thus, a trial court cannot satisfy its oversight obligation in an IDEA case by reciting the catechism of independent review and then failing to practice what it preaches. But when, as now, a trial court delineates the proper rule of decision, citing book and verse, the burden of demonstrating that the court is merely mouthing empty platitudes rests with the

party who mounts the accusation. This is a heavy burden; it cannot be carried by perfervid rhetoric or glib wordplay. To prevail on such a theory, the accuser must offer solid indications that the district court in fact strayed from the straight and narrow. After all, an appellate tribunal ought not lightly assume that a federal trial judge is indulging in the adjudicatory equivalent of a shell game.

In this instance, we think the accusation that the judge said one thing, but did another, is unfounded. The Lenns' most touted point is their asseveration that the district court expressly invoked the clear-error standard when it noted that a court is "not confined to the hearing officer's decision if [it] find[s] clear error." D.Ct.Op. at 10. Based primarily on this remark,[4] appellants invite us to disregard the court's professed allegiance to the correct standard of review. We decline the invitation.

First and foremost, we simply cannot credit appellants' argument that this isolated reference indicates a wholesale abandonment of the principles of independent review. We think it is far more likely, all things considered, that the reference to "clear error" represents simply an infelicitous choice of phrase. Indeed, a close perusal of the record makes manifest the depth of judicial involvement and provides clinching evidence that the district judge utilized the approved level of review. The transcript reveals that the judge took a hands-on approach to the decisional process. Instead of limiting his perscrutation to the administrative record, he conducted what amounted to a mini-trial, hearing testimony from two witnesses regarding Daniel's educational needs and receiving newly emergent documentation chronicling Daniel's progress at Eagle Hill. The judge then carefully scrutinized all the evidence, new and old, and drew his own conclusions from it. This is the very stuff from which independent review is fashioned.

■ We have said enough. The law does not require district courts to be precise to the point of pedantry. Consequently, an appellate court must not hesitate to excuse an awkward locution and give a busy trial judge a bit of breathing room. If using the wrong word or phrase constituted grounds for reversal in every case, much too high a premium would be placed on sheer literalism. We have regularly refused to exact that premium. *See, e.g., Roland M.*, 910 F.2d at 991 n. 4 (disregarding district court's "infelicitous" choice of terminology where "the context, and other statements in the court's memorandum" made plain that the court fully understood the operative legal principle); *Collins v. Marina–Martinez*, 894 F.2d 474, 477 n. 4 (1st Cir.1990) (similar); *Desfosses v. Wallace Energy, Inc.*, 836 F.2d 22, 30 (1st Cir.1987) (similar); *United States v. Kobrosky*, 711 F.2d 449, 456 (1st Cir.1983) (similar); *see also Clauson v. Smith*, 823 F.2d 660, 663 n. 3 (1st Cir.1987) ("We have held before, and today reaffirm, that if '[a] reading of the colloquy and decision as a whole ... indicates that, despite some loose use of language, the proper ... standard was applied,' we will not reverse on the basis of what amounts to a *lapsus linguae*.") (citation omitted); *cf. Hampton*, 976 F.2d at 54 (rejecting, on a burden of proof issue, appellants' "contention that the district court actually did something other than that which it said it was doing"). So here. Mindful that pettifoggery, for its own sake, benefits no one, we will not disregard the totality of the circumstances in a headlong rush to elevate formalism over substance.

■ We add, moreover, that even if Judge Brody used the challenged terminology in a purposeful manner, we would not reverse. The "clear error" reference appears in a paragraph in which, after restating the hearing officer's key findings—that the 1991–92

---

**4.** The district court also wrote that it found "ample evidence in the record" to support the hearing officer's decision. D.Ct.Op. at 10. Appellants argue that this statement manifests an abandonment of the preponderance-of-the-evidence test. This argument proves nothing more than appellants' penchant for grasping at straws—especially since the context makes clear

that the lower court applied the proper test; indeed, in the very same paragraph of its opinion, the court used the phrase "preponderance of the evidence." *Id.* We will neither confine district courts to the rote recitation of buzzwords nor penalize them for relieving the tedium of opinion writing by the occasional employment of artful synonyms.

IEP offered Daniel a major change in services and that the new mix was reasonably calculated to bestow a significant educational benefit on him—the judge acknowledged his duty to afford the administrative proceeding due weight.[5] A reference at this juncture to clear error is not inappropriate since the precise degree of deference attributable to a hearing officer's *subsidiary* findings of fact in an IDEA case ultimately rests within the trial court's discretion. *See, e.g., Hampton,* 976 F.2d at 52; *Westmoreland,* 930 F.2d at 946; *Burlington,* 736 F.2d at 792. That the district court may have afforded particular administrative findings substantial respect— even deference on a par with clearly erroneous review—would not comprise reversible error so long as the court made an independent ruling as to the IEP's adequacy based on a preponderance of all the evidence, including the hearing officer's duly weighted findings.

This criterion was satisfied. The opinion as a whole shows conclusively that the judge made an independent determination concerning the adequacy of Portland's IEP, throwing all the available evidence into the pot. Among other things, Judge Brody specifically discussed the testimony of Daniel's teachers in Portland, the testimony of the Cleveland Clinic's independent evaluators, and Daniel's standardized test scores. D.Ct.Op. at 11. He also cited additional record evidence that buttressed the hearing officer's evaluation of Daniel's past progress in the Portland public schools and the likelihood of future educational benefits should the 1991–92 IEP be implemented. *Id.* at 10. Last, but surely not least, the judge applied the proper burden of proof, concluding that the Lenns had not "proven [their case] by a preponderance of the evidence." *Id.*[6]

It strains credulity to assume, in these circumstances, that the district court's lonely reference to "clear error" heralds an intention to disregard a standard of review explicitly described in the court's opinion and indelibly etched upon its pages. Hence, we find no warping of the standard of review. We hasten to add, however, that even if the controversial phrase represents more than a slip of the district court's pen—a supposition that we deem unsubstantiated—the reference, by itself, does not call into question the court's proper performance of its oversight function.

**B**

■ Appellants next assert that the district court must "determine separately for each area of identified educational need . . . whether, by a preponderance of the evidence, [an IEP] addresses that need" sufficiently. Appellants' Reply Brief at 11. Building on this premise, appellants then conclude that the court below emasculated the requirement by failing to consider "separately" and "directly" whether Portland's IEP addressed Daniel's non-academic needs in a meaningfully beneficial way. We disagree with both the premise and the conclusion.

■ Admittedly, an IEP is designed as a package. It must target "*all* of a child's special needs," *Burlington,* 736 F.2d at 788 (emphasis supplied), whether they be academic, physical, emotional, or social. *See Roland M.,* 910 F.2d at 992 (explaining that "purely academic progress . . . is not the only indici[um] of educational benefit"); *Timothy W. v. Rochester, N.H. Sch. Dist.,* 875 F.2d 954, 970 (1st Cir.) (observing that "education" under the Act is broadly defined), *cert. de-*

---

5. The court wrote: "While we are not confined to the hearing officer's decision if we find clear error, we are constrained in that we cannot impose our view of preferable educational methods upon the state." D.Ct.Op. at 10.

6. While the Lenns grudgingly acknowledge this reference, they maintain that the court erred by requiring them to prove that *only* Eagle Hill will provide Daniel with an appropriate education when, in fact, their burden was merely to prove the inappropriateness of Portland's IEP. On balance, we do not believe it can fairly be said that

the court misapprehended the contours of the issue. Throughout its pages, the district court's opinion is geared toward determining whether "the proposed IEP was reasonably calculated to enable Daniel to receive educational benefits." D.Ct.Op. at 10. Indeed, the court pointedly wrote that "[a]lthough the Eagle Hill residential program may well be the ideal educational environment for Daniel, that is not the legal standard under [the] IDEA." *Id.*

This specific disclaimer sounds the death knell for appellants' argument.

*nied,* 493 U.S. 983, 110 S.Ct. 519, 107 L.Ed.2d 520 (1989); U.S. Dep't of Educ., Notice of Policy Guidance, 57 Fed.Reg. 49,-274 at 49,275 (1992) (stating that an IEP must address "the full range of the child's needs"). Because a one-dimensional view of an IEP would afford too narrow a foundation for a determination that the program is reasonably calculated to provide "effective results" and "demonstrable improvement" in the various "educational and personal skills identified as special needs," *Burlington,* 736 F.2d at 788, a district court's determination that an IEP complies with the Act necessarily involves a host of subsidiary determinations.

Be that as it may, appellants' legal formulation distorts the Act's requirements. The Act does not mandate, nor has any court held it to require, that the district judge must consider each unique need in isolation and make a separate finding regarding the preponderance of the evidence in each and every identified area. Such a requirement would serve merely to balkanize the concept of educational benefit and to burden the district courts without producing any offsetting advantages. We hold that no such requirement exists. In the last analysis, what matters is not whether the district judge makes a series of segregable findings, but whether the judge is cognizant of all the child's special needs and considers the IEP's offerings as a unitary whole, taking those special needs into proper account.

The record also belies appellants' self-serving suggestion that the district court assessed Daniel's academic needs in a vacuum. A trial court charged with evaluating the adequacy of an IEP cannot be said to have committed legal error as long as (1) it does not overlook or misconstrue evidence of rec-ord, and (2) its overall decision is based upon a supportable finding that the program described in the IEP is reasonably calculated to address the handicapped child's education-related needs, both academic and non-academic. The district court's finding in this case fits comfortably within that rubric. We explain briefly.

The district court explicitly acknowledged "Daniel's self-esteem and social skills needs" and took pains to limn the "wide range of after-school support services" proposed by Portland to address those needs. D.Ct.Op. at 8. In considering the likely impact of these services, the court focused on Portland's plan to provide a social skills facilitator and opined that, although hiring a facilitator might not be the best mechanism for addressing Daniel's needs, "the ideal" is not "the legal standard under [the] IDEA." *Id.* at 10; *see also id.* at 12. The court observed that Portland's program would "enable Daniel to remain in his home community and interact daily with non-disabled peers," *id.* at 10, thus furthering his social development.[7] Finally, the judge mentioned that while "the goals for Daniel's social and organizational skill development would be more useful if they could be objectively measured," *id.* at 11 n. 2, this deficiency does not undermine the IEP.

Based on these, and other comments, it is clear beyond hope of contradiction that Portland's ability to address Daniel's non-academic needs informed the district court's overall determination that the IEP comports with the Act's requirements. No more is exigible.

## IV. WEIGHT OF THE EVIDENCE

Appellants' final assignment of error posits that the district court blundered in

---

7. We do not accept appellants' hypothesis that the mainstream nature of a proposed placement can never enter into the primary analysis of an IEP's adequacy. When a child, like Daniel, demonstrates a particular need for learning how to interact with non-disabled peers, a mainstream placement will almost inevitably help to address that need. Such an integral aspect of an IEP package cannot be ignored when judging the program's overall adequacy and appropriateness. The Third Circuit, which recently reaffirmed the special nature of the educational benefits that mainstream programs confer, apparently shares this view. *See Oberti v. Board of Educ.,* 995 F.2d 1204, 1216 (3d Cir.1993) (observing that, in assessing the educational benefit of placing a handicapped child with non-handicapped peers, "the court must pay special attention to those unique benefits the child may obtain from integration in a regular classroom ..., *i.e.,* the development of social and communication skills from interaction with nondisabled peers").

concluding that Portland's IEP would provide Daniel with an appropriate public education. We discern no clear error. To the contrary, the record fully sustains a finding that Portland's IEP is adequate and appropriate to ensure the requisite degree of educational benefit.

On this score, appellants' cardinal contention is that Portland's IEP fails to take account of Daniel's inadequate social skills. We demur. The record reflects that the IEP forthrightly addresses this area of critical need, offering Daniel an array of after-school socialization services. For example, Daniel would spend three hours a day, three days a week, with a social skills facilitator, who would encourage and oversee his involvement in extracurricular and community-based activities. The facilitator would work to hone Daniel's skills in relating to non-disabled peers in a real-world milieu.[8] On the remaining school days, Daniel would receive social skills programming in more structured environments, spending one afternoon at a one-on-one counseling session with a doctorate-level psychologist and the other in the company of handicapped peers at a group counseling session devoted to self-esteem issues. Thus, while Portland's IEP may not contain the precise programs that the parents prefer, it embodies a substantial, suitably diverse socialization component.

On the academic side, the IEP places Daniel in a small, special education class for English (with a student/teacher ratio of eight-to-three) and four mainstream educational courses (ranging in size from fifteen to eighteen students per class). In the mainstream classes (at least three of which would be taught or co-taught by a special educator), Daniel would study Western civilization, mathematics,[9] science, and an elective. The special English class would occupy the first period of every day and would prepare Daniel organizationally for the remainder of the day. A small group session held during the last period would help Daniel synthesize the day's lessons, hone his organizational skills, and teach him homework strategies. Portland also offered (1) personalized instruction in custom-tailored learning techniques, on a daily basis, to assist Daniel in mastering the curriculum; and (2) a home/school coordinator to work once a week with Daniel's mother to synthesize home and institutional instruction.

Under federal law, Portland's IEP package must assure Daniel a "basic floor of [educational] opportunity." *Rowley*, 458 U.S. at 201, 102 S.Ct. at 3048 (internal quotation marks omitted). The finding that Portland's proposal at least reaches this floor cannot be faulted. The school committee tendered a rigorous program, to be administered by a highly experienced and well-credentialed team, catering to the full range of Daniel's needs through a variety of mechanisms.[10] The academic schedule, with its mix of mainstream courses, small-class instruction, and private programming in compensatory skills, furnished abundant reason for the hearing officer and the court below to find that the IEP would likely achieve measured success.[11]

8. To be sure, there is room for principled disagreement about the efficacy of a social skills facilitator. Portland's witnesses and plaintiffs' experts expressed widely divergent views on this topic. But, judges are not especially well-equipped to choose between various educational methodologies. *See Rowley*, 458 U.S. at 207–08, 102 S.Ct. at 3051–52. Where, as here, there is satisfactory record support for the appropriateness of the particular approach selected by the school department and approved by the state education agency, a reviewing court should not meddle. *See id.; see also Roland M.*, 910 F.2d at 992 (warning that "courts should be loathe to intrude very far into interstitial details or to become embroiled in captious disputes as to the precise efficacy of different instructional programs").

9. The mainstream math class contemplates individual instruction geared to each student's level and needs—an especially important feature given the nature of Daniel's handicap and the problems he has encountered in dealing with applied mathematics.

10. Appellants criticize the IEP for offering no services geared toward physical education or health management needs. In fact, the IEP affords Daniel an individualized physical education program as well as a choice of extracurricular athletic activities. Since the record fails to demonstrate that Daniel suffers an infirmity in motor coordination or personal hygiene that would require specially designed programs, no more is required.

11. Significantly, teachers who had previously taught Daniel in large, mainstream classes testi-

The IEP's non-academic component—which includes numerous one-on-one and small-group services geared toward fostering self-esteem, enhancing socialization skills, developing organizational abilities, and perfecting homework techniques—furnishes a satisfactory predicate for a similar finding in respect to non-academic needs. .

In short, Portland's IEP provides "personalized instruction with sufficient support services to permit [Daniel] to benefit educationally from that instruction." *Rowley*, 458 U.S. at 203, 102 S.Ct. at 3049. What is more, it allows Daniel to live at home with supportive parents, to be educated with non-disabled peers, and to interact regularly with the members of his community.[12] It follows inexorably that the district court's findings of appropriateness and adequacy comfortably survive clear-error review.

## V. CONCLUSION

We need go no further.[13] The trial court correctly discerned the relevant legal principles and applied them to the task at hand. Its conclusion that Portland's proposed 1991–92 IEP meets Daniel's needs is supported by the record. Finding no significant error of law or fact, we affirm the judgment below.

*Affirmed.*

---

fied that he participated in class activities, did well, felt good about his work, and achieved passing grades.

12. This mainstream approach, which places Daniel in "the least restrictive environment" appropriate to his needs, 34 C.F.R. § 300.552(d) (1992), is the preferred choice under the Act. *See* 20 U.S.C. § 1412(5); *see also Rowley*, 458 U.S. at 202, 102 S.Ct. at 3048–49.

13. Appellants' brief is larded with claims that a fundamentally flawed process created substantive infirmities in Portland's IEP. However, in the district court, appellants stipulated to the absence of any disputed procedural issues. Because these procedural claims have not been properly preserved, they need not be addressed in this venue. *See United States v. Slade*, 980 F.2d 27, 31 (1st Cir.1992) (discussing raise-or-waive rule); *Hampton*, 976 F.2d at 53–54 (refusing to consider claims not articulated to the district court).