## NAUGATUCK BOARD OF EDUCATION

v.

### MRS. D., et al.

### No. 3:95cv1782 (AHN)DW.

United States District Court,
D. Connecticut.

July 1, 1998.

Mark Sommaruga, Svlliran, Schoen, Campare & Connon, Hartford, CT, for Naugatuck Board of Education.

Tom Fiorentino, Attorney General's Office, Hartford, CT, for DCF.

Mary Jean Schierberl, Connecticut Legal Services, New Britain, CT, for Mrs. D.

## RULING ON MOTIONS FOR PARTIAL SUMMARY JUDGMENT

NEVAS, District Judge.

The plaintiff, Naugatuck Board of Education ("Naugatuck"), brings this action against the defendants, Mrs. D, parent of M. L., State of Connecticut Board of Education ("SBE"), and State of Connecticut Department of Children and Families ("DCF"), to, *inter alia,* appeal a SBE due process hearing officer's decision regarding M.L.'s residential placement and Naugatuck's provision of a free appropriate education to M.L.[1]

---

1. The pending motions relate to Naugatuck's al-    legations in Counts One and Three of the Amend-

Now pending before the court are Naugatuck's, Mrs. D's, and DCF's partial motions for summary judgment. For the reasons set forth below, Naugatuck's motion [doc. # 63] is DENIED, and DCF's and Mrs. D.'s motions [docs. # 61, 66] are GRANTED.

## STANDARD OF REVIEW

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the moving party is entitled to judgment as a matter of law. *See* Rule 56(c), Fed.R.Civ.P.; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The substantive law governing the case identifies those facts that are material on a motion for summary judgment. *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. A court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact." Rule 56(c); *see Miner v. Glens Falls,* 999 F.2d 655, 661 (2d Cir.1993) (citation omitted). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Aldrich v. Randolph Cent. Sch. Dist.,* 963 F.2d 520, 523 (2d Cir. 1992) (internal quotation marks and citation omitted). The burden of showing that no genuine dispute about an issue of material fact exists rests on the party seeking summary judgment. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

After discovery, if the party against whom summary judgment is sought "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then summary judgment is appropriate. *Celotex Corp. v.*

*Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In assessing the record to determine whether a genuine dispute as to a material fact exists, the court is required to resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. *See Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. Thus, "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.1991) (citation omitted).

## FACTS

Mrs. D.; a Naugatuck resident, is the parent of M.L., a twelve-year old who is disabled within the meaning of Connecticut and federal law. *See Naugatuck Bd. of Educ. v. Mrs. D.,* Case No. 3:95cv1782 (AHN), 1997 WL 205791, * 2 (D. Conn. April 17, 1997). SBE is Connecticut's agent in all matters related to education, including special education. *Id.* DCF, another Connecticut agency, is responsible for serving the needs of the state's families and children. *Id.* Among other things, DCF provides for mental health services through psychiatric clinics and community mental health facilities. *Id.* DCF also develops and maintains a program of day treatment centers and extended day treatment programs for emotionally disturbed, mentally ill, behaviorally disordered and multiple handicapped children and youth. *Id.*

Prior to August, 1992, when Mrs. D. moved to Naugatuck, M.L. received special education and related services from his previous school districts. (*See* Pl.'s Stat. Mat. Facts Not in Dispute ¶ 5.) He also underwent psychological and psychiatric evaluations in which he was diagnosed with Attention Deficit Disorder with Hyperactivity and Oppositional Defiant Disorder.[2] (*See* R. Exs. B-5;

---

ed Complaint. On April 11, 1997, the court denied Naugatuck's, SBE's and DCF's motions for partial summary judgment with respect to Count Two. The parties have agreed that, until the court rules on the present motions, it should stay consideration of the merits of Count Two, which alleges that SBE and DCF have neither promulgated proper interagency agreements, nor established procedures for initiating the development of an interagency agreement, as required

by the Individuals with Disabilities Education Act.

2. In a September 23, 1991 psychiatric evaluation, Dr. Arlene D. Kalman recommended that M.L. be placed in "a very structured and nurturing classroom." (R. Ex. B-5 at 5.) She explained that "[h]e needs limits to be very clearly defined and the consequences for violating behavioral

P–2 at 1.) As early as November, 1991, M.L. exhibited "inappropriate behaviors [which] presented significant management demand on the classroom teacher, disrupting both peers and classroom routine." (R. Ex. B–7 at 2.) In fact, in July, 1992, after being admitted to Elmcrest Psychiatric Hospital ("Elmcrest"), for the first time due to out of control and aggressive behavior at home, Dr. Kenneth Gilstein ("Gilstein") evaluated him and concluded that "due to concentration difficulties, emotional problems and Attention Deficit Disorder with Hyperactivity, [M.L.] will most probably have a great deal of difficulties in mainstream academic endeavors, especially if [his] personal and family problems continue." (R. B–12 at 3.) Gilstein warned that his "[p]otential behavior would include acting out, attention seeking, [and] oppositional behavior towards peers and authority figures." (*Id.*)

On August 20, 1992, upon entering the Naugatuck school district, a Planning and Placement Team ("PPT") meeting was held to discuss M.L.'s Individual Education Plan ("IEP"). (*See* First Am. Compl. Ex. 1 [hereinafter "Hearing Officer's Decision"] at 2.) At that meeting, based on prior reports suggesting that M.L. was having "difficulties with behavioral controls," he was placed in a "Learning and Adjustment Program" for students with social and emotional difficulties. (*Id.*) While this was a self-contained program, it allowed children to be mainstreamed for physical education and music classes. (*See* Pls.' Stat. ¶ 8.)

On November 19, 1992, another PPT meeting was held. The team decided to place M.L. in a mainstream classroom for story time and mathematics because it had determined that he was doing well in the classes in which he was already mainstreamed, and his behavior in the self-contained environment was improving. (*See* Pls.' Stat. ¶ 8(a); R. Ex. B–16 at 2.)

Soon after, however, M.L.'s behavior began to deteriorate. A PPT report of a December 10, 1992 meeting made the following observations:

> In the past month, [M.L.] is having increased difficulties controlling his behavior. He has stated that if he misbehaves he will not have to come to school. [Mrs. D.] has stated that since November 10, 1992, [M.L.] is no longer taking his medication. For the past month, his attention to tasks is decreasing. The teacher needs to stay with [M.L.] while he is in time-out because he cannot control his behavior. Bus drivers have also stated that his behavior is ... becoming increasingly disruptive.[3] Alternative transportation may be needed if he continues with unacceptable behavior. [M.L.'s] mother will be taking [M.L.] to the therapist tonight and will discuss the changes in [his] behavior.

(Hearing Officer's Decision at 5; R. Ex. B–22.) The PPT recommended that M.L.'s IEP be altered to reflect his change in behavior. (*See* Hearing Officer's Decision at 5.)

On January 20, 1993, M.L. once again entered the treatment program of the Saybrook Unit at Elmcrest. (*See* Pls.' Stat. ¶ 9; Hearing Officer's Decision at 5.) The initial psychiatric evaluation indicated that M.L. was impulsive and aggressive at home and in school.[4] (*See* R. Ex. P–3 at 1.) It concluded that M.L. required in-patient care "[d]ue to [his] suicidal and self-endangering behavior[ ]." (*Id.* at 3.)

Upon admission, Elaine Dougherty ("Dougherty"), the School Liaison, sent a letter to Robert Cronin ("Cronin"), the Assistant Director of Special Services for Naugatuck Public Schools, informing him that M.L. would be attending school at Elmcrest and recommending that a PPT meeting be convened as soon as possible to discuss his IEP. (*See* R. Ex. B–23 at 1; Hearing Officer's Decision at 5.) In an agreement signed on

---

norms need to be set in a gentle but consistent way." (*Id.*)

**3.** On October 26, 1992, a school bus incident report stated that M.L. was making "unnecessary noise" and "sound effects," "refus[ing] to keep his vocabulary decent," displaying "rude, discourteous and annoying conduct," and exhibiting

"other behavior relating to safety, well-being and respect for others." (R. Ex. B–17; Hearing Officer's Decision at 3.)

**4.** Mrs. D. informed the Elmcrest staff that, on a couple of occasions, M.L. had smeared his feces on the wall, both at home and at school. (*See* R. Ex. P–3 at 3.)

this same date, Naugatuck stated that, because it was "unable to provide [M.L. with an] appropriate Special Education program through its public school arrangements," Elmcrest would provide him with such a program and ensure that it was specifically suited to his needs. (*See* R. Ex. B–28 at 1.) Naugatuck further agreed to pay Elmcrest for its provision of these educational services. (*Id.*)

On February 1, 1993, M.L. was again referred to Dr. Gilstein for a psychological evaluation. (*See* Hearing Officer's Decision at 7.) Gilstein made the following observations and recommendations:

Intellectually, [M.L.] is currently functioning within average range. Potentially, he has the abilities to function in the average range in the school setting, however, due to an Attention Deficit Disorder with Hyperactivity and to significant underlying psychopathology, he will have a great deal of difficulty being maintained in a mainstream classroom setting. A highly structured setting with a great deal of one-on-one help would be recommended. This is a troubled youngster. . . . It is strongly recommended that continued residential treatment be offered. The concern of this examiner is that if [M.L.] does not receive continued residential treatment, . . . he will continue to decompensate and act out angrily towards others, or possibly himself.

(R. Ex. B–31 at 3.) At a February 2, 1993 PPT meeting, the Elmcrest staff recommended a "self-contained class with a therapeutic component." (R. Ex. B–32.) At this time, Mrs. D. indicated that she would contact DCF about a possible residential placement. (*Id.*)

Another PPT meeting was held on February 9, 1993 to discuss M.L.'s discharge from Elmcrest. (*See* Hearing Officer's Decision at 8.) While Naugatuck claimed that it could provide for M.L.'s educational needs, it decided that, because Elmcrest could better serve his emotional and psychiatric needs, he would continue to participate in Elmcrest's Day Treatment Program, a non-residential educational program. (*See id.*; R. Ex. B–34.) As before, Naugatuck signed an agreement with Elmcrest in which it stated that it

was "unable to provide the appropriate Special Education program [to M.L.] through its public school arrangements" and would therefore pay Elmcrest to furnish him with an appropriate education. (*See* R. Ex. 35 at 2.) At this time, Mrs. D. stated that she disapproved of any future decision to return M.L. to the Naugatuck school system. (*See* R. Ex. B–34.)

On April 7, 1993, M.L. was discharged from the Day Treatment Program and hospitalized at Elmcrest's full-time residential facility. (*See* Pls.' Stat. ¶ 12.) His discharge summary from the non-residential program indicated that he had not responded very well to the program's treatment for his suicidal ideation and out of control and impulsive behavior and that he had continually tried to run away from the hospital. (*See* R. Exs. P–5 at 3, P–6 at 2.) Thus, to better deal with these problems and to prevent him from leaving the residential facility, Elmcrest placed him in its full-time hospitalization program.

Dougherty sent Cronin a letter informing him that M.L. had been transferred to inpatient treatment and recommending that a PPT meeting be held as soon as possible to develop an appropriate IEP. (*See* R. Ex. B–38.) As before, Naugatuck signed another contract with Elmcrest in which it agreed to reimburse Elmcrest for the cost of M.L.'s education, in light of its admission that it could not adequately provide for his educational needs. (*See* R. Ex. B–37 at 1.)

On April 29, 1993, M.L. was discharged from Elmcrest. (*See* R. Ex. P–6 at 1.) His discharge summary states that he was very oppositional towards the staff and continually used inappropriate sexual language and gestures. (*See id.* at 3.) He also had difficulty interacting with his peers, frequently acting aggressively towards them. (*Id.*)

Upon M.L.'s discharge from Elmcrest and based on its recommendation, DCF placed M.L. in the Boys' Village Residential Program ("Boys' Village"). (*See* Pls.' Stat. ¶ 12(a); Hearing Officer's Decision at 9.) Naugatuck entered into a contract with Boys' Village under which it agreed to be responsible for the cost of the educational component

of the program and DCF agreed to be responsible for the cost of the residential placement. *See Naugatuck Bd. of Educ. v. Mrs. D.*, 1997 WL 205791, at * 2. While M.L. was functioning well academically at Boys' Village, he was having behavioral problems. A December 20, 1993 progress stated the following:

> Behavioral Performance: This is an area where [M.L.] has most of his problems. He has difficulty remaining in his seat and on task, poor peer relations, inappropriate language, makes sexual comments and gestures. [M.L.] has a hard time focussing on his own issues. He tends to act like a tough guy and bully and instigate peers. He can also be aggressive. One on one or small groups work best for him.

(R. Ex. B–42 at 4.)

In December, 1993, the residential component of Boys' Village closed, and DCF transferred M.L. to the Children's Center Residential Facility ("Children's Center"), where M.L. remained through the filing of this law suit. (*See* Pls.' Stat. ¶ 13; R. Ex. B–45 at 2.) Naugatuck continued to follow the same arrangement, under which it assumed responsibility for the educational cost of the placement, and DCF assumed responsibility for the residential cost. (*See* R. Ex. B–45 at 2.) In connection with this change, a PPT meeting was held on December 21, 1993. At that meeting, it was noted that M.L. continued to have problems relating with his peers, exhibiting physically aggressive behavior and using inappropriate language. (*See* R. Ex. B–45 at 3.) Mrs. D. could not come to that PPT meeting, and therefore, the school sent her a copy of the PPT report. (*See* R. Ex. 46.)

On March 30, 1994, Jean Link ("Link"), M.L.'s teacher at the Children's Center, submitted an assessment which indicated that M.L. continued to have behavioral problems which affected his overall performance in school. (*See* R. Ex. P–7 at 4.) Specifically, Link stated that his preoccupation with sexu-

al thoughts and anxiety was distracting him from his school work and preventing him from maintaining healthy peer relationships.[5] (*Id.*) According to Link, "M.L. exhibits a great deal of difficulty following directions and needs to be separated from [his] peer group as much as possible." (*Id.*) She further explained that he was not getting his work done because he often refused to sit in his seat, and, at best, would remain seated for only sixty percent of the day. (*Id.*) On some days, she wrote, M.L. would "concentrate[ ] upon work for about fifteen minutes." (*Id.*)

On April 12, 1994, a PPT meeting was held to develop M.L.'s IEP for the next school year. (*See* R. Ex. 49.) As with the previous PPT meeting, Mrs. D. did not attend, and the school sent her a copy of the PPT report. (*See* R. Ex. B–50.) The report indicated that "[M.L.'s] attention and concentration, as well as, social adaptation, pose great challenges for him" and concluded that he would continue his residential placement at the Children's Center.[6] (*See id.* at 2.) Naugatuck signed another contract with the Children's Center, by which it agreed to pay for the educational component of M.L.'s placement for the coming school year. (*See* R. Ex. B–51.)

On October 25, 1994, Dr. Gilstein performed another psychological evaluation on M.L. Gilstein described M.L. as "an anxious, depressed and confused individual who is reacting to a highly conflicted relationship with his parents, a great uncertainty about himself, and a fear of an environment which he perceives as very threatening and hostile." (R. Ex. P–8 at 2.) As before, Gilstein stated that M.L. had problems concentrating and anticipating social situations, and therefore, would have trouble with "mainstream academic endeavors." (*Id.*) He concluded, "[t]his is a boy who is very much at risk for decompensation and needs to be in a highly structured environment with appropriate medication." (*Id.* at 3.)

---

**5.** Link describes this "sexualized" behavior: "He frequently touches his genitals and makes sexually motivated sounds and gestures." (R. Ex. P–7 at 4.)

**6.** Consistent with Link's observations, the PPT report stated that (1) M.L.'s social adaptation

was "well below grade level;" (2) he continued to have problems with peers and adults because of inappropriate sexual gestures and comments; and (3) his attention span was very poor. (*See* R. Ex. B–49 at 3.)

On November 29, 1994, due to a fire setting incident at the Children's Center, M.L. was transferred for evaluation to Yale's Children Psychiatric Unit ("Yale") which is "designed to assess and educate children while hospitalized and to work collaboratively with local school districts in the development of educational plans upon discharge." (*See* Pl.'s Stat. ¶ 14; R. Ex. B–54 at 1.) Despite requests by Yale, there is no record that a PPT meeting was held to discuss M.L.'s initial placement in Yale's program. (*See* R. Ex. B–56 at 2–3.) Nonetheless, anticipating a December 22, 1994 discharge from this program and a return to the Children's Center, Cronin scheduled a PPT meeting for December 20, 1994 to both review the results of Yale's evaluations and review M.L.'s existing IEP.[7] (*See* R. Ex. B–58 at 1.) According to the report of this meeting, M.L. continued to have difficulty concentrating, and his rating for "social adaptation" was "well below grade level," particularly in light of his "inappropriate sexual comments and gestures." (*Id.* at 4.)

On December 16, 1994, Mrs. D. initiated a special education due process hearing. (*See* Hearing Officer's Decision at 1.) The hearing commenced on January 11, 1995 and continued on February 7, 1995, March 6, 1995, March 14, 1995 and May 11, 1995. (*Id.*) Mrs. D. raised three issues:

1. Is [Naugatuck] providing [M.L.] a free appropriate public education?

2. Has [Naugatuck] complied with the procedural requirements of federal and state law in its provision of services to the student with regard to developing the student's individual education program, obtaining parental consent, notifying the parent adequately, offering alternative placements and evaluating [M.L.'s] special education and related services needs?

3. What are [M.L.'s] special education and related services needs?

(*Id.* at 2.)

The hearing officer ruled that (1) Naugatuck was not providing M.L. with a free appropriate public education ("FAPE"); (2) M.L.'s IEP did not meet the requirements of the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400–1485 ("IDEA"); and (3) M.L. needed a residential placement "reasonably calculated to enable him to receive the benefit of special education and related services in a residential setting." (*Id.* at 21.) The hearing officer also denied Naugatuck's motion to cite DCF as a party, ruling that it could resolve the above issues without requiring DCF's participation. (*See id.* at 16.)

By this action, Naugatuck seeks, *inter alia,* to overturn the hearing officer's decision. Naugatuck appeals the decision under 20 U.S.C. § 1415(e)(2) and (f), (*see* First Am. Compl. First Count), and claims that it violates Conn. Gen.Stat. § 10–76d(e)(2) by requiring Naugatuck to pay for the entire cost of M.L.'s residential placement, (*see id.* Third Count). *See* Conn. Gen.Stat. § 10–76d(e)(2) (providing that where a state agency such as DCF has placed a child in a residential facility, the local educational agency will be responsible for the costs of special education instruction). The parties have substantially agreed as to the facts underlying these claims and believe that the court can resolve them as a matter of law on cross motions for summary judgment.

## DISCUSSION

The IDEA is "an ambitious federal effort to promote the education of handicapped children." *Board of Educ. v. Rowley,* 458 U.S. 176, 179, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). Such children include those with either "serious emotional disturbance[s]" or "specific learning disabilities." *Id.* at 181, 102 S.Ct. 3034. Under the IDEA, a state must ensure that "[a] free appropriate public education is available to all children with disabilities residing in th[at][s]tate between the ages of 3 and 21." 20 U.S.C.A. § 1412(1)(A) (West 1998 Supp.). This must include "special education and related services tailored to the individual needs of the child, pursuant to an [IEP]." *Mrs. B. v. Milford Bd. of Educ.,* 103 F.3d 1114, 1115 (2d Cir.1997) (quoting 20 U.S.C. § 1401(a)(18)) (internal quotation marks omitted). The IEP is "a written program of instruction" that the local educational agency, in cooperation with

---

7. Mrs. D. did not attend this PPT meeting.

a child's teacher and parents, generates to suit the particular needs of that child. *Id.* (citing 20 U.S.C. § 1401(a)(20)). This program must provide for "specially designed instruction, at no cost to parents or guardians, that meets the unique needs of a child with a disability." *Id.* (citation and internal quotation marks omitted).

If a child's parents are not satisfied with the IEP or anything related to their child's educational program, they may file a complaint with the state which is resolved at an impartial, due process hearing. *See* 20 U.S.C. § 1415(b)(1)(E), (b)(2). The hearing officer's decision can then be appealed to a state or federal court having jurisdiction over the parties. *See id.* § 1415(e)(2).

▮▮▮ Judicial review under the IDEA "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Lenn v. Portland Sch. Committee*, 998 F.2d 1083, 1086 (1st Cir.1993) (quoting *Rowley*, 458 U.S. at 206, 102 S.Ct. 3034). While the reviewing court must base its decision on a preponderance of the evidence after considering the hearing officer's findings of fact and conclusions of law, and, where appropriate, hearing additional evidence, it must still give "due weight" to the administrative proceedings below. *See Murray v. Montrose County Sch. Dist. RE–1J*, 51 F.3d 921, 927 (10th Cir. 1995). This "modified de novo review," *Doe v. Board of Educ.*, 9 F.3d 455, 458 (6th Cir.1993), "contemplates an intermediate standard of review ... [that] requires a more critical appraisal of the agency determination than clear-error review entails, but which nevertheless, falls well short of complete de novo review." *Lenn*, 998 F.2d at 1086. As the court stated in *Lenn*, "the [district] judge is not at liberty either to turn a blind eye to administrative findings or to discard them without sound reason." *Id.* at 1087. Recently, the Second Circuit explicitly adopted this standard, holding that federal courts "are expected to give due weight to [administrative decisions], mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 119, 130 (2d Cir.1998); *see also Wall v. Mattituck–Cutchogue Sch. Dist.*, 945 F.Supp. 501, 507 (E.D.N.Y.1996) (adopting "due weight" standard); *J.B. By and Through C.B. v. Essex–Caledonia Supervisory Union*, 943 F.Supp. 387, 390 (D. Vermont 1996) (same); *Wills v. Ferrandino*, 830 F.Supp. 116, 121 (D.Conn.1993) (same).

In the present case, the hearing officer concluded that Naugatuck failed to provide M.L. with a FAPE. (*See* Hearing Officer's Decision at 21.) In doing so, he found that M.L.'s IEP was inadequate under IDEA because it was not reviewed and revised in response to changes in M.L.'s social and educational environment. (*Id.*) In addition, he denied Naugatuck's motion to bring DCF in as a party to the due process complaint, finding that he could determine whether Naugatuck was complying with IDEA's requirements without requiring DCF to be present during the proceedings. (*See* 3/14/95 Tr. at 19–20.) While Naugatuck insisted that it was adequately providing for M.L.'s educational needs and that his residential placement was not related to such needs, the hearing officer was not persuaded. He found that M.L. did, in fact, require a residential placement in order to adequately accommodate his educational needs. (*See* Hearing Officer's Decision at 21.)

▮▮▮ By this appeal, Naugatuck essentially argues that it provided M.L. with adequate educational services until DCF, for non-educational reasons, placed him in a residential facility. Specifically, Naugatuck claims that the hearing officer erred in holding that it did not provide M.L. with a FAPE and that DCF placed M.L. in a residential facility for educationally related reasons. Naugatuck also seeks to shift its potential financial responsibility for M.L.'s residential placement onto DCF. Citing Conn. Gen.Stat. § 10–76d(d), which states that whenever a child's special education needs could have been met by a program within the school district, the local board of education is only responsible for the costs of special education instruction at the residential facility, Naugatuck claims that it could have provided M.L.

with a FAPE and therefore should not be responsible for the entire cost of his residential placement. In further support of its argument, Naugatuck cites Conn. Gen.Stat. § 10–76d(e)(2), which provides that when a child is placed in a residential facility by a public agency, the local school board responsible for that child should be responsible only for the costs of his or her education in the facility.[8]

The court is not persuaded by Naugatuck's claims. First, it bears mention that the hearing officer *did not* specifically determine what entity would be responsible for the costs of M.L.'s residential treatment. In fact, the hearing officer never discussed the state statutes cited by Naugatuck, but rather limited his inquiry and finding to determining whether Naugatuck failed to provide M.L. with a FAPE and whether M.L.'s educational needs required a residential placement. Thus, the court will limit its review to these findings. It follows, however, that if the court affirms the hearing officer's decision, Conn. Gen.Stat. §§ 10–76d(d) and 10–76d(e)(2), which only apply to placements made for non-educational reasons, would not govern the plaintiff's liability.

As to the merits of Naugatuck's underlying challenge, the court cannot locate sufficient objective evidence in the record which supports overturning the decision. The hearing officer was thorough and careful in his review of the record, and his conclusions are well supported by the evidence presented. Thus, granting the decision the "due weight" to which it is entitled and recognizing that "[d]eference is particularly appropriate when, as here, the state hearing officer's review has been thorough and careful," *Walczak*, 142 F.3d 119, 130, the court affirms his decision.

To support its claims, Naugatuck largely relies on the testimony of Nancy Wilcox

("Wilcox"), M.L.'s special education teacher during his brief tenure in the Naugatuck Public Schools. Wilcox testified that M.L.'s behavior was acceptable in all of his classes, including those in which he was mainstreamed, and that, academically, he was on grade level.[9] (*See* 3/14/95 Tr. at 59–62.) She further testified that, while in her class, M.L. was benefitting from his educational program. (*Id.*)

However, Wilcox only spent four months with M.L.—from September, 1992, when he entered the Naugatuck Public Schools to January, 1993, when he was admitted to Elmcrest. Further, she admitted during her testimony at the hearing, that by December, 1992, M.L.'s classroom behavior had severely deteriorated. This deterioration is reflected both in a December 10, 1992 PPT report (*see* R. Ex. B–22)[10] and in Wilcox's comments on a January 22, 1993 report card. (*See* R. Ex. B–24 at 2 (stating, "[t]here have been significant changes in [M.L.'s] behavior since the last report card conference. Consequences seem irrelevant, as it appears that [M.L.] has his own agenda in mind.").)

Even if the court accepted Wilcox's testimony on its face, it alone would be insufficient to rebut the substantial contrary evidence relied upon by the hearing officer in reaching his decision that Naugatuck was not providing for M.L.'s educational needs. On January 28, 1993, Barbara Murray–Lane, a Primary Therapist at Elmcrest, and C. Preston Wiles, an Attending Psychiatrist at Elmcrest, sent Naugatuck Public Schools a letter regarding M.L. (*See* R. Ex. B–27 at 1.) The letter stated that M.L. was "exhibit[ing] very bizarre and disturbing behaviors and thoughts" and that he had "an underlying preoccupation with violence, aggression and sexuality." (*Id.*) It further stated:

Due to these behaviors which are chronic and severe, the treatment team at Elm-

---

**8.** At oral argument, DCF's attorney explained that, unlike a residential placement under the IDEA, for which the parents cannot be held financially responsible, DCF ordinarily seeks reimbursement from parents for non-educationally related residential placements.

**9.** Notwithstanding Naugatuck's claim that M.L. never engaged in inappropriate behavior while in

the Naugatuck Public Schools, even Wilcox admitted that, on one occasion, M.L. was caught smearing feces on a mirror in a school bathroom. (*See* 3/14/95 Tr. at 65.)

**10.** In fact, this PPT report indicates that M.L.'s behavior on the bus was so disruptive that alternative transportation was being considered. (*See* R. Ex. B–22.)

crest recommends that [M.L.] return home upon discharge to a structured self-contained educational program with a therapeutic component. It is recommended that [Mrs. D.] pursue residential placement if this plan fails.

(*Id.*)

Then, in a February 1, 1993 psychological evaluation of M.L., Dr. Gilstein echoed these sentiments, concluding that M.L. would have a lot of trouble surviving in a mainstream classroom. Specifically, Gilstein stated,

A highly structured setting with a great deal of one-on-one help would be recommended. This is a troubled youngster.... It is strongly recommended that continued residential treatment be offered.

(R. Ex. B–31 at 2–3.) [11]

Gilstein's testimony at the due process hearing was equally persuasive. Based on four interviews with M.L. between 1991–1995, he recommended that M.L. be placed in a highly structured residential setting to deal with his family problems and a highly structured educational setting to deal with his Attention Deficit Disorder. (*See* Hearing Officer's Decision at 17.) Gilstein warned that M.L. would suffer without an appropriate residential program. (*Id.*) He concluded:

There is the probability of regression without the therapeutic component. [M.L.'s] acting out aggressively, suicidal thinking, homicidal thinking, depression and thinking process would worsen. [M.L.] has a full-blown thinking problem. Persons with these emotional problems change their reality to make themselves feel safer. They flee into a reaction. [M.L.] would not benefit from a regular class on an ongoing basis. He needs 24 hour therapeutic support to make gains.... Public school staff [are] not trained to deal with [M.L.'s] suicide/homicide/decompensation problems. His is in a crisis situation with on-going

health problems and cannot be dealt with effectively in a public school setting.

(*Id.*)

Gilstein's recommendations are further supported by reports from M.L.'s teachers at the Boys' Village and the Children's Center. A December 20, 1993 progress report from the Boys' Village stated that one-on-one interaction or small groups worked best for M.L. because he was aggressive with his peers and had difficulty remaining in his seat and on task. (*See* R. Ex. B–42 at 4.) In addition, Link, M.L.'s teacher at the Children's Center, testified that he would continually get into fights with his peers in the classroom and make sexual gestures and comments to them. (*See* 2/7/95 Tr. at 95.) According to her, his behavior was so disturbing to his peers that she felt he would be ostracized in a public school setting. (*See id.* at 97.) In fact, at the due process hearing, she expressed a strong belief that M.L. "would not be getting an education" if he did not have the "outlets in which to express himself" and the services offered by a residential facility.[12] (*Id.*) She explained that, at the Children's Center, his behavior "would escalate to the point where he was running out of the building ... talk[ing] about wanting to kill himself." (*Id.* at 95.) This presented another problem for a public school setting. As Link related, "if he ran from a residential treatment center[,] ... there [would be] staff [on the grounds] that could come and get him and bring him back, [which] would be safer." (*Id.* at 96.)

■ Naugatuck maintains that DCF placed M.L. in a residential facility for *non*-educational reasons and therefore should be responsible to pay for the non-educational costs of such a placement. However, DCF's involvement in M.L.'s residential placement does not lessen Naugatuck's responsibilities under the IDEA. Had Naugatuck, in response to Elmcrest's January 28, 1993 letter,

---

**11.** Despite these recommendations, on February 9, 1993, the PPT determined that M.L. would not be placed in residential treatment, but instead would go back into Elmcrest's Day Treatment Program. (*See* R. Ex. B–34.) However, two months later, Elmcrest determined that M.L.'s needs would be better served by a residential placement at Boys' Village. (*See* R. Exs. P–5, P–

6.) With DCF's intervention, this placement was effected in April, 1993.

**12.** According to Link, a residential treatment facility offered M.L. access to therapy by professionals trained in the area of sexual abuse. (*See* 2/7/95 Tr. at 96–97.)

or Gilstein's February 1, 1993 recommendation, placed M.L. in a residential facility, DCF likely would never have gotten involved in this case. DCF became involved at Mrs. D.'s behest, only after Naugatuck determined that a residential placement was not necessary for educational reasons. If the court were to overturn the hearing officer's decision, in the future Naugatuck could refuse to place any special education student in residential placement and instead wait for another state agency, such as DCF, to step in and pay for placement in a residential facility. Such a perverse incentive would be most harmful to those students in need of immediate residential placement for educational reasons.[13]

In *Mrs. B. v. Milford Bd. of Educ.,* the Second Circuit encountered a similar situation to the one here. In that case, after the local school board refused to place a seventeen year-old student who had been described as emotionally unstable and in need of a highly structured educational environment, DCF placed her in a residential facility. The local school board, after concluding that this student had been placed in the facility for "counseling and behavior modification to respond to emotional and psychological problems [and] not for reasons related to her education," only agreed to pay for the educational portion of the placement. *See id.,* 103 F.3d at 1118. The parents sought a due process hearing to challenge the local school board's decision. However, the hearing officer sided with the school board, putting great weight on the fact that DCF arranged for the residential placement and reasoning that "where predominantly and significantly the child's problems grow

out of the home situation rather than the school environment, the school cannot be taken to task." *Id.* at 1119 (internal quotation marks omitted).

The district court overturned the hearing officer's decision. *See id.* at 1120. The court was persuaded by a line of cases that held school boards liable for residential placements of children having interrelated emotional and educational disabilities. *See, e.g., Vander Malle v. Ambach,* 667 F.Supp. 1015, 1039 (S.D.N.Y.1987) (stating that "when the medical, social or emotional problems that require hospitalization create or are intertwined with the educational problems, the states remain responsible for the costs of residential placement").

The Second Circuit affirmed, specifically finding that the hearing officer relied on Conn. Gen.Stat. § 10–76(e)(2) without considering IDEA's requirements. *See Mrs. B.,* 103 F.3d at 1122 (stating that "the 'due weight' we ordinarily must give to the state administrative proceedings is not implicated with respect to [the] conclusion [regarding the application of Connecticut law], because it concerns an issue of law; namely, the proper interpretation of the federal statute and its requirements"). The Court further stated, "[i]f institutionalization is required due to a child's emotional problems, and the child's emotional problems prevent the child from making meaningful educational progress, the [IDEA] requires the state to pay for the costs of the placement." *Id.* at 1122.[14]

As in *Mrs. B.,* this is a case where M.L.'s emotional and educational problems inter-

---

13. According to Robert Cronin, Naugatuck's Director of Special Services, at the time of the due process hearing, none of Naugatuck's 750 special education students were being provided residential treatment for educational purposes. (*See* 1/11/95 Tr. at 61.) In fact, he claimed that he was not sure if, under the IDEA, such placement could be required for any of these students. (*See id.* at 60–61.) To the extent that Naugatuck had a policy of denying residential treatment unless it was proposed and arranged by another agency, such as DCF, a ruling in Naugatuck's favor here would only encourage it to continue this policy.

14. Naugatuck argues that the court's decision in *Mrs. B.* does not apply here because it held that

the "state," and not the school board, was responsible for the costs of the residential placement. This argument is rejected by the court. The Milford Board of Education and Milford Public Schools were the defendants in *Mrs. B.* The state of Connecticut was not named in the action. Thus, the Second Circuit's use of the term "state" obviously referred to defendants Milford Board of Education and Milford Public Schools, and *not* to the state of Connecticut. This reading of the opinion comports with its ultimate conclusion that "the defendants[, Milford Board of Education and Milford Public Schools,] were obliged to pay for the entire cost of the residential placement."

sect. Mrs. D. asserts, and the court agrees, that, while M.L.'s academic problems were not serious, his social and emotional problems were severe and qualified as educational needs which warranted residential placement. As the Second Circuit stated,

> [t]he fact that a residential placement may be required to alter a child's regressive behavior at home as well as within the classroom, or is required due primarily to emotional problems, does not relieve the [school board] of its obligation to pay for the program under federal law so long as it is necessary to insure that the child can be properly educated.

*Mrs. B.*, 103 F.3d at 1122; *see also McKenzie v. Smith*, 771 F.2d 1527 (D.C.Cir.1985) (holding that the state was responsible for funding the residential treatment of a child with severe emotional disabilities because the child required a highly structured environment in order to learn).

Thus, the court affirms the hearing officer's decision. First, Naugatuck failed to provide M.L. with a FAPE in the least restrictive environment, as required by the IDEA. Second, Naugatuck failed to adequately change M.L.'s IEP to reflect his rapidly declining behavior in class, his ongoing social and emotional problems and his need for educationally related residential placement. In this way, Naugatuck violated the requirements of IDEA by not considering residential placement as one of the alternative placements available to M.L. Lastly, M.L.'s residential placement was a *necessary* component of his special education instruction.

In accordance with these findings, Mrs. D.'s and DCF"s motions for summary judgment as to Count One are GRANTED. Furthermore, because Conn. Gen.Stat. §§ 10–76d(d) and (e)(2) do *not* apply where, as here, a residential placement is required for educational reasons, summary judgment must enter for DCF on Count Three.

### CONCLUSION

For the reasons stated above, Naugatuck's Supplemental Motion for Summary Judgment [doc. # 63] is DENIED, and DCF"s and Mrs. D.'s Partial Motions for Summary

Judgment [docs. # 61, 66] are GRANTED. The parties are hereby directed to contact the court within thirty days of the filing of this ruling to schedule a status conference with respect to the disposition of Count Two, the sole remaining claim.

SO ORDERED this 1st day of July, 1998 at Bridgeport, Connecticut.