W.A. and M.A. as parents on behalf of W.A., Plaintiffs,

v.

Salvatore PASCARELLA, Superintendent of old Saybrook Board of Education and the Old Saybrook Board of Education, Defendants.

No. 3:93CV1570(JBA).

United States District Court, D. Connecticut.

July 30, 2001.

Bet Gailor, Granby, CT, Arthur Allan Smith, Mansfield Center, CT, for Plaintiffs.

Michael Peter McKeon, Mark J. Sommaruga, Sullivan, Schoen, Campane & Connon, Hartford, CT, for Defendants.

Carroll T. Willis, Jr., Atty. Gens. Office, Hartford, CT, for Dept. of Educ.

## MEMORANDUM OF DECISION

ARTERTON, District Judge.

In this action under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1415, plaintiffs W.A. and M.A., parents of the minor child W.A., claim that the Old Saybrook Board of Education and its superintendent violated certain procedural requirements of the IDEA and its accompanying regulations, and as such deprived them of their entitlement to meaningful participation in the development and implementation of an Individualized Education Plan (IEP) for their child, plaintiff W.A. After a Connecticut state hearing officer decided against them, plaintiffs filed a timely appeal to this Court. On September 2, 1999, Magistrate Judge Fitzsimmons issued a recommended ruling denying plaintiffs' motion for summary judgment and granting defendants' cross-motion for summary judgment. Doc. # 45.

On September 24, 1999, this Court approved and adopted the recommended ruling absent objection. Doc. # 48. The plaintiffs had, however, filed their objection pursuant to Rule 72(b) of the Federal Rules of Civil Procedure and Local Rule for United States Magistrates 2(a), although the objection had not been docketed at the time of the Court's ruling. *See* Doc. # 47. Given this overlap, the Court granted plaintiffs' motion to vacate the judgment order. Doc. # 57. Due to a docketing error, however, the original cross motions for summary judgment were not reinstated on the docket as pending motions, thus leading to a regrettably long delay in addressing the motions. After being apprised of the case's status by the ever-patient parties, the docketing error was corrected, and this Ruling follows.

### Review of the Administrative Record[1]

The following facts are drawn from the parties' Local Rule 9(c) Statements, *see* Docs. # 26, # 29, # 31 [2], and the administrative record before the Court. At the time this action was filed, W.A. was an eleven year-old student who had been diagnosed with attention deficit-hyperactivity disorder and a severe language impairment, and who required special educational services. Defendant Old Saybrook Board of Education (Board) is the local agency responsible for providing education, including special education and related services, to children with disabilities who reside in Old Saybrook. W.A. has been in the Board's special education program since preschool, and in the fourth grade was placed in a class where instruction was provided by the co-teaching model, whereby a certified special education teacher taught full-time alongside the regular classroom teacher. Perruccio Test. at p. 35. On April 7, 1992, an IEP was developed for W.A. for the 1992–93 school year that, due to W.A.'s progress, did not in-

---

1. The administrative record forwarded to the Court includes transcripts from ten days of administrative hearings ("__ Test."), exhibits introduced at the hearing by the parents ("P–__"), the Board ("B–__"), the State Board ("SB–__"), and hearing officer exhibits ("H.O.Ex."), as well as the decision of the Hearing Officer (SB–23).

2. Plaintiff has not filed a Local Rule 9(c)(2) Statement of Disputed Facts.

clude a special education teacher in the classroom. P.Ex. 108. Instead, the IEP provided for 21 hours per week of regulation education instruction, 4 and one half hours per week of special education instruction, and two and one quarter hours per week of "related services" including speech/language consultation. *Id.*

On November 4, 1992, a Planning and Placement Team meeting (PPT) was convened to discuss difficulties W.A. was experiencing in his fifth grade classroom, and to "discuss possible changes" in the IEP. *See* P–111 (Notification of Planning and Placement Team Meeting). The following persons attended: W.A.'s parents, W.A. and M.A.; Salvatore Perruccio, the school psychologist; Thomas Shea, W.A.'s fifth grade classroom teacher; Lauren Brazicki, a private speech/language tutor; Christine Comiskey, the Board's speech and language teacher; Sue Joyce, the school social worker; and Carol Garman, W.A.'s special education teacher. P–112 (Planning and Placement Team Minutes). Ms. Garman and Ms. Comiskey agreed that "William and other special ed students' needs were not being addressed as well as they might be" in W.A.'s fifth grade class, due to the diversity and academic range of the students. *Id.* at p. 2. The participants in the meeting discussed "ways to best serve William and other Special Ed students in the fifth grade," with "[t]he overall concern [ ] on having another full time Special Ed teacher to help within Mr. Shea's self-contained class." *Id.* W.A.'s parents "agreed with this plan and desire to pursue this goal using the proper channels." *Id.* According to their testimony at the hearing, the participants in the November 4 PPT were in agreement that a full-time special education teacher was "the way to go." Brazicki Test. p. 28; *see also* Garman Test. p. 105 ("the team came to a consensus that [W.A.] did need a special ed teacher"); Perruccio Test. at p.

36 ("I thought a special ed teacher should have been put in a long time ago"); Shea Test. at p. 19 ("I believe there was consensus that [W.A.] should have [a special education teacher]"); Comiskey Test. at p. 16 ("my feeling is that there was consensus among the teachers and the school psychologist that, yes, that would be the way to go"). On a scheduling matter, the parents requested a revision to the IEP to allow W.A. to participate in band. The IEP was accordingly revised to reflect a two and a half hour per week reduction in W.A.'s special education hours and a three hour per week increase in his regular education hours. P–113. No mention is made of a full-time special education teacher for W.A.'s fifth grade classroom.

Another PPT was convened on November 16, 1992, with W.A.'s parents, Brazicki, Shea, Garman, Perruccio and Joyce in attendance, as well as the following individuals: Tamara Rich, Director of Pupil Services; Michael Rafferty, school principal; and William Dineen, the Associate Principal. P–115. According to the minutes, Garman stated that "she was unable to spend as much time as she would like in Mr. Shea's class," and W.A.'s private speech/language tutor opined that he should "receive ½ hour checks throughout his school day to make sure he is understanding all material presented to him." P–115. At this point, W.A.'s parents "requested that a full-time Special Ed teacher be placed in Mr. Shea's class to follow the 4th grade model." *Id.* Dr. Rich agreed to "consider the possible alternatives and suggest a plan of action to [W.A.'s parents] and parties concerned by noon Wednesday, November 18." *Id.* Dr. Rich followed up with W.A.'s parents in a letter dated November 18, 1992, stating that she believed they had agreed upon a process to investigate program modifications, including meeting with Superintendent Burgess

to "present your request for a special education teacher to work in a co-teaching model," that Dr. Rich would "formulate a written staffing and program request for the Middle School to be shared with the Superintendent," and that Superintendent Burgess would "determine the next appropriate step." P–116. Dr. Rich also stated in this letter that W.A.'s parents had given her their permission "to go ahead and make the recommended changes within Mr. Shea's class (as per PPT of 11/16/92)." *Id.*

In November of 1992, Lauren Roderick was assigned to work with W.A. in Mr. Shea's fifth grade classroom as a special needs assistant. Roderick Test. at p. 4. Dr. Rich did draft recommendations for the Special Needs program at the middle school on November 24, 1992, noting that the co-teaching model was implemented in the fourth grade last year and "has been perceived by students, parents and teachers as being *very successful,*" and that "[a] number of parents requested to have their children receive services in the team-teaching model. This request, if not addressed, could result in legal action." P–117 at p. 2 (emphasis in original). She concluded with a recommendation that the Board "[a]dd one (1) certified staff member and reorganize schedules to provide a team-teaching model in grade five." *Id.* at p. 3. The report did not mention W.A., and Superintendent Burgess testified that while he understood the request came out of a PPT regarding W.A., "the request that came to me was a general request that we needed a special education teacher not only for [W.A.] but for helping a lot of other students in that classroom as well." Burgess Test. at 109–110. Dr. Rich's report was presented to the Board at its December 1, 1992 meeting, but the Board did not authorize the creation of an additional teacher position. P–123. Prior to this proposal, however, W.A.'s parents had signed a Request for an Impartial Special Education Hearing with the State Department of Education. P–122. The request states that W.A.'s parents felt that their child:

> requires a full-time special education teacher with language background in order to profit from his current placement. The educators and administrators agreed with the exception of the Pupil Personnel Director who wants to put this on hold while she does a study to present to the Board of Education and the superintendent. We feel this process will take too long and jeopardizes our son's education because of the loss of precious time.

*Id.*

The State Department of Education held ten days of administrative hearings over a five month period. Fifteen witnesses testified, and voluminous exhibits were submitted. On June 28, 1993, the Hearing Officer issued her decision. *See* SB–23. The Hearing Officer found that neither of the November PPT's altered W.A.'s IEP to include a full-time special education teacher in his fifth grade classroom, and that the staff members who participated in these PPT's believed that the addition of a full-time special education teacher would be the best program for W.A. but that these staff members "did not seem knowledgeable about the concept of best versus appropriate." SB–23, HO Decision at 7. She concluded that the PPT team members' recommendation was a "programmatic one and seemed to be a way for the school to try to implement a program need rather than necessity to meet the needs of a specific child." SB–23, HO Conclusions of Law ¶ 9. The Hearing Officer noted that while staff members felt that W.A. needed more help to ensure that he received the best program possible, the IDEA only mandates an adequate program. *Id.,* ¶ 10.

Because "all the records indicate that [W.A.] has made very good progress, is on grade level or above in most academic areas," she concluded that W.A.'s IEP "as written and implemented" provided him with a fair and appropriate public education (FAPE). *Id.* ¶ 11.

The Hearing Officer rejected all of the parents' contentions, and even those of the staff members who had opined that W.A. required more language therapy and teacher attention. The Hearing Officer posited that too much language therapy can be excessive, and that "hovering" by too many staff members might deprive W.A. of his "independence to internalize what had been taught to him." *Id.* at ¶¶ 12, 13. The Hearing Officer appears to have blamed the district and staff members for creating the parents' misunderstanding regarding the full-time special education teacher, and warned against using PPT's to attempt to create programmatic change. The Hearing Officer chastised Dr. Rich for some informality and laxity in the district's procedures, and directed her to "do staff training concerning the parameters of IDEA and Section 504 particularly as regards programming needs and students' rights, the difference between appropriate and best, the role of the PPT, the duties of a chairman ... and that the clear focus of PPT is the child in question and should not stray from that to peripheral program and administrative issues." *Id.* ¶ 21. She concluded, in relevant part, as follows:

1. The PPT meetings in November, 1992 recommended a full time special education teacher for the program and not to specifically meet [W.A.'s] needs.

2. The Board of Education, therefore, did not violate [W.A.'s] rights by not authorizing the hiring of an additional special education teacher.

3. [W.A.'s] IEP and its implementation as it currently exists provides him with a FAPE in the least restrictive environment.

SB–23, HO Decision at 18.

### Magistrate Judge's Recommended Ruling

The Magistrate Judge largely agreed with the Hearing Officer's conclusions. Plaintiff appealed the administrative decision, contending that defendants violated the IDEA by when they "failed to develop and implement an IEP in accordance with the recommendations of the November 4 and November 16, 1992 PPTs." Doc. # 28 at 3. Plaintiffs did not challenge the Hearing Officer's determination that the IEP in effect provided W.A. with an appropriate education, but argued that the defendants committed an egregious procedural violation of the IDEA when the Board failed to implement the PPT team's recommendation for another full-time special education teacher in fifth grade. Magistrate Judge Fitzsimmons disagreed, noting that school systems do not incur liability for discussing ways to better or best serve their students. Because the IEP had never been revised to require a full-time special education teacher, the Board's rejection was not an "impermissible veto of an adopted IEP," but was instead a policy determination. The parent's recourse, Judge Fitzsimmons concluded, was to challenge the adequacy of the services provided their child. Because the Hearing Officer's finding in that regard was not challenged, the Magistrate Judge found that "the plaintiff (sic) suffered no injury from the claimed violations of the IDEA." Doc. # 45 at p. 11.

### Discussion

#### A. Standard of Review

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial burden of demonstrating an absence of material facts and once it has done so, the burden shifts to the non-moving party. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548 (1986). In deciding a summary judgment motion, the court must resolve ambiguities and draw all reasonable inferences in the light most favorable to the non-moving party. See *id.* at 322–23, 106 S.Ct. 2548; *Castle Rock Entertainment, Inc. v. Carol Pub. Group, Inc.,* 150 F.3d 132, 137 (2d Cir. 1998).

On cross-motions for summary judgment "neither side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it. When faced with cross-motions for summary judgment, a district court is not required to grant judgment as a matter of law for one side or the other." *Heublein, Inc. v. United States,* 996 F.2d 1455, 1461 (2d Cir.1993) (citing *Schwabenbauer v. Board of Educ. of Olean,* 667 F.2d 305, 313 (2d Cir.1981)). "Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Schwabenbauer,* 667 F.2d at 314.

The Court conducts a de novo review of proposed findings and recommendations in a magistrate judge's report to which a party has filed timely objections. *See* 28 U.S.C. § 636(b)(1)(C). Plaintiffs object to Magistrate Fitzsimmon's ruling, arguing that 1) the Magistrate Judge relied on immaterial facts and failed to find material facts essential plaintiffs' claims of procedural noncompliance; and 2) the Magis-

trate Judge applied the wrong legal standard to the facts. Plaintiffs contend that the Magistrate Judge erred by recommending that the defendants' motion be granted, and that as the facts are largely undisputed, summary judgment should enter in the plaintiffs' favor instead.

**B. Individual with Disabilities Education Act**

■ Federal courts assess IDEA petitions based on the "preponderance of the evidence developed at the administrative proceedings and any further evidence presented by the parties." *Walczak v. Florida Union Free Sch. Dist.,* 142 F.3d 119, 122–23 (2d Cir.1998), *citing* 20 U.S.C. § 1415(e)(2) (1994)). However, this assessment "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Board of Educ. v. Rowley,* 458 U.S. 176, 206, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982) (considering the Education for All Handicapped Children Act, subsequently amended and renamed IDEA). "While federal courts do not simply rubber stamp administrative decisions, they are expected to give 'due weight' to these proceedings, mindful that the judiciary generally 'lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'" *Walczak,* 142 F.3d at 129 (quoting *Rowley,* 458 U.S. at 206, 102 S.Ct. 3034 (internal quotation marks and citation omitted)); *see also Karl v. Board of Education of Geneseo School District,* 736 F.2d 873, 876–77 (2d Cir.1984) (mandating such deference even when second level state reviewing agency disagrees with hearing officer). The Court will accordingly adhere to these principles in reviewing the hearing officer's decision in the instant case.

■ The IDEA, 20 U.S.C. §§ 1400–1485, is a comprehensive statutory framework that was enacted by Congress to aid states and localities in providing disabled children with a "free appropriate public education," or "FAPE." 20 U.S.C. § 1400(c); *Mrs. W v. Tirozzi*, 832 F.2d 748, 750 (2d Cir.1987).[3] Federal funding is conditioned upon a state's implementation of a policy, reflected in a state plan, that assures all handicapped children the right to a FAPE. 20 U.S.C. § 1412(1); *Rowley*, 458 U.S. at 181, 102 S.Ct. 3034. Such an education must be tailored to meet the unique needs of the individual child which is accomplished by the formulation of an individualized education plan, or IEP, for that child. *Karl*, 736 F.2d at 876. IDEA includes an elaborate set of procedures intended to ensure parents' participation in the ongoing development of their child's educational program. *School Committee of Burlington v. Dept. of Educ. of Mass.*, 471 U.S. 359, 368, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985). If a child requires special education, a school district must convene a team to formulate an IEP in light of the child's abilities and parental views about the child's education. 34 C.F.R. §§ 300.343(b)(2), 300.346(a)(1). The IEP is "the modus operandi of the Act [and] . . . is in brief a comprehensive statement of the educational needs of a handicapped child and the specially designed instruction and related services to be employed to meet those needs." *Burlington*, 471 U.S. at 368, 105 S.Ct. 1996 (1985). The parents, the child's teacher, and a school official knowledgeable about special education must be included on the team which devises and reviews the IEP, and parents are free to invite other individuals with expertise to participate. *Burlington*, 471 U.S. at 368, 105 S.Ct. 1996, *Doe by Gonzales v. Maher*, 793 F.2d 1470, 1489 (9th Cir.1986); 34 C.F.R. § 300.344. The IEP must be reviewed at least once a year, and it should be periodically revised in response to information provided by the parents and to ongoing evaluations of the child's progress. *Id.* at § 300.343(c)(2).

■ The instant case involves requirements for an IEP. The parents contend that because the participants in the November 4 PPT (which included the parents) unanimously recommended that a special education teacher be added to W.A.'s fifth grade classroom to "co-teach" the fifth grade class with Mr. Shea, the failure to revise the written IEP to reflect this consensus constitutes a procedural violation of the Act. The parents also charge that Dr. Rich's actions in failing to revise the IEP but instead seeking Board approval for an additional special education teacher constituted an impermissible subversion of the requirements of the Act. According to the parents, the district was required to revise the IEP once the PPT team reached agreement, their argument continues, and allowing school districts to take the course followed by Dr. Rich and the Board is tantamount to allowing school district's "to supercede the IEP team's authority to develop and implement IEPs." Pl.Mem. (Doc. # 47) at 8. Plaintiffs follow up their argument with citation to a line of cases holding that the procedural

---

**3.** Under IDEA, "the term 'free appropriate public education' means special education and related services that—

(A) have been provided at public expense, under public supervision and direction, and without charge;

(B) meet the standards of the State educational agency;

(C) include an appropriate preschool, elementary, or secondary school education in the State involved; and

(D) are provided in conformity with the individualized education program required under section 1414(d) of this title." 20 U.S.C.A. § 1401(7).

rights created by the IDEA are considered coequal with the Act's substantive entitlements, and that therefore serious procedural defects can justify an automatic finding of denial of a FAPE. The Board responds that the only focus is on the current IEP—if that IEP provides W.A. with an FAPE, the inquiry is at an end. Because plaintiffs' do not challenge the Hearing Officer's decision that W.A.'s IEP as written and implemented provided him with a FAPE, the Board continues, plaintiffs' appeal must fail.

Neither the Magistrate Judge nor the Hearing Officer addressed this argument head on, finding instead that because the IEP was never revised to require a full-time special education teacher, the discussion at the PPTs regarding the salutary effects of hiring such a teacher was merely precatory, expressing the team's belief as to the course of action that would best serve W.A.'s needs, as well as those of other fifth grade students. Failure to provide the best possible education does not violate the IDEA, and therefore failure to incorporate these "programmatic" recommendations into the IEP did not violate the law. *See* Mag. Ruling (Doc. # 45) at p. 10; Sb–23, HO Decision at 15. Plaintiffs' argument seems to be, however, that the IEP *was* effectively revised by virtue of the PPT team's agreement, and that the procedural defect lies in the school district's failure to formally amend the written IEP to reflect that change. Condoning the proceedings in this case would make a mockery of the parental participation requirements, by plaintiffs' telling, because the PPT process would become a charade, a meaningless procedure with the ultimate decision-making authority resting in the hands of the Board.

The Supreme Court has recognized the importance of the procedural safeguards set out in the IDEA, and the Court shares plaintiffs' concern with preserving the rigor of these requirements. *See Rowley*, 458 U.S. at 206, 102 S.Ct. 3034 ("It seems to us no exaggeration to say that Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure or participation at every stage of the administrative process ... as it did upon the measure of the resulting IEP against a substantive standard."). The Court is also cognizant of the case law holding that failures to meet the Act's procedural requirements can be adequate grounds by themselves for holding that a school district has failed to provide a FAPE. *See, e.g., Hall v. Vance County Board of Educ.*, 774 F.2d 629, 635 (4th Cir.1985). Nonetheless, the Court concludes that the Hearing Officer was correct in her decision that the Board did not violate W.A.'s rights by failing to hire a special education teacher to co-teach his fifth grade classroom.

The regulations promulgated under the IDEA set forth a number of requirements for an IEP and its implementation. Under the regulations, an IEP must be in effect at the beginning of the school year, before special education and related services are provided, 34 C.F.R. § 300.342; a meeting must be convened to develop, review or revise an IEP, 34 C.F.R. § 300.343; appropriate individuals must participate in the meeting, including a representative who is "qualified to provide ... special education," 34 C.F.R. § 300.344; districts must take steps to ensure parental participation, including notice requirements and the provision of interpreter services, if necessary, 34 C.F.R. § 300.345; and the IEP itself must contain a statement of present levels of educational performance, annual goals, specific special education and related services to be provided, appropriate objective criteria and evaluation procedures. 34 C.F.R. § 300.346. All of these requirements were

met in the instant case by the April IEP, as revised pursuant to the November 4 PPT. *See* B–58 pp. 9–19 (IEP for 1992–93 school year); P–113 (revision to IEP to reflect additional regular educational hours for band). Plaintiffs have not pointed to any specific procedural requirements that were infringed in developing W.A.'s IEP; rather, they posit some sort of duty on the part of the district to revise the IEP to incorporate the recommendations from the PPT of November 4. The mere fact that all participants were in agreement at that meeting, however, does not translate into a substantive entitlement to a particular educational service under the Act, without a revision to the IEP. It is the IEP that sets the parameters of the district's obligation, and by statute, an IEP must be in writing. 20 U.S.C. § 1401(11); *see also Heather S. v. Wisconsin,* 125 F.3d 1045, 1054 (7th Cir. 1997) (assessing whether school district correctly evaluated and identified student; noting that unanimity is not required, and opinions expressed during discussions are not binding in terms of identification of student; "[t]he question is not what was discussed, or what an individual member believed about her condition, but rather what the school district concluded. And that is determined by the content of the IEP.")

Of course, the district may not circumvent the Act's requirements by simply refusing to incorporate the unanimous recommendation of an IEP team into that student's IEP. There is some case law supporting the proposition that once consensus is reached, the revised IEP goes into effect, and parents have a right to a due process hearing should they believe that the revised IEP does not adequately reflect that consensus. *See, e.g., Gonzales v. Maher,* 793 F.2d 1470, 1490 (9th Cir. 1986). Any such due process hearing, however, would address whether the IEP as written and implemented provided a free and appropriate public education to the student—an issue that the parents here do not challenge. *See* 20 U.S.C. § 1415(b)(6); (f). Plaintiffs have cited no case law holding that unanimity of recommendation at a PPT constructively revises the IEP, and creates an federally-protected entitlement to the services agreed upon, even when the currently operative IEP as written provides a free and appropriate public education. This dearth of case law is reflective of the fact that the inquiry in an IDEA case is not whether the education provided for under the IEP "maximize[s] the potential of handicapped children." *Rowley,* 458 U.S. at 197 n. 21, 102 S.Ct. 3034; *see also Walczak,* 142 F.3d at 130. Rather, the purpose of the Act was "more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside." *Id.* at 192, 102 S.Ct. 3034, *accord Lunceford v. District of Columbia Bd. of Educ.,* 745 F.2d 1577, 1583 (D.C.Cir.1984) (Ruth Bader Ginsburg, J.) (because public "resources are not infinite," federal law "does not secure the best education money can buy; it calls upon government, more modestly, to provide an appropriate education for each [disabled] child"); *cited in Walczak,* 142 F.3d at 130. The consensus at the meeting as to the "ways to best serve [W.A.] and other Special Ed students," P–112, therefore, does not correlate with a finding that W.A.'s then-operative IEP did not provide for a FAPE.

The Court also agrees that there was substantial evidentiary support in the administrative record for the Hearing Officer's conclusion that the PPT participants were more concerned with structural and programmatic changes when they testified as to the consensus regarding the need for a fifth grade special education teacher. *See* Perruccio Test. at 34–36 (having fifth

grade special education teacher would ease transition for children who had co-teaching model in fourth grade; thought "a special ed teacher should have been put in [fifth grade] a long time ago."); Rafferty Test. at 91–93, 96–100 ("Quite a bit" of discussion in the PPT about the needs of other special education students in fifth grade classroom); Garman Test. at 110, 128 (held opinion that more special education teachers were needed in the school, placement of teacher in fifth grade class would benefit W.A., but not for his benefit alone); Shea Test. at 157, 1711 (addition of special education teacher would be benefit to entire class). In their testimony at the hearing, the participants in the PPT meeting also expressed their support for the idea of having a fifth grade special education "co-teacher" for Mr. Shea's class in terms of the additional progress it would help W.A. to achieve. Shea Test. at p. 159; Garman Test. at 136.

The participants of the PPT might have been in agreement that a full-time special education teacher would be a good idea, in that a co-teaching model would serve all of the fifth grade students and allow W.A. to better progress in achieving his educational goals, but the best educational outcomes are not required by the IDEA. As the Supreme Court has noted, a school meets its obligations to provide a FAPE if the disabled student's IEP is "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 206–07, 102 S.Ct. 3034. Of course, a FAPE must confer more than "some minimal academic advancement." *Hall v. Vance County Bd. of Educ.*, 774 F.2d 629, 636 (4th Cir.1985), but the record supports the Hearing Officer's finding that W.A. had made "excellent academic progress" over time, particularly after Ms. Roderick was added to the fifth grade classroom as a teacher's aide. *See* B–58 at p. 7–8 (Speech and Language Progress Report

for fourth grade); B–65 (January 1993 report cards); HO–6 (second quarter report card); HO–12. Given this finding by the Hearing Officer, which is not challenged by the parents, the Court is in agreement that the IEP extant in November of 1993 provided an FAPE, even though it was not revised to incorporate the recommendation of the PPT for an additional full-time fifth grade teacher.

As an additional argument, plaintiffs cite to case law suggesting that gross procedural violations alone can constitute a denial of a FAPE, without inquiring into whether a child was receiving sufficient educational benefits. In *W.G., B.G. v. Board of Trustees of Target Range School District No. 23*, 960 F.2d 1479, 1484 (9th Cir.1992), the circuit court noted:

> Procedural flaws do not automatically require a finding of denial of a FAPE. However, procedural inadequacies that result in the loss of educational opportunity, or seriously infringe the parents' opportunity to participate in the IEP formulation process, clearly result in the denial of a FAPE.

*Id.* As noted above, however, plaintiffs do not identify a particular procedural requirement that was not followed in the instant case, other than their central contention that consensus requires a revised IEP. Plaintiffs argue that the reasons articulated at the administrative hearing for why the IEP was not modified themselves make up the procedural violation, in that a number of participants testified that the IEP was not revised to call for an additional special education teacher because they did not believe they had the authority to make such a decision. *See, e.g.* Perruccio Test. at 38 (PPT participants at November 4 meeting did not have authority to hire additional teacher, so recommendations not implemented); Comiskey Test. at 64 (additional special education teacher not

written into IEP because "that's something that has to be Board approved,"); Rafferty Test. at p. 92 (as administrator of the school, neither he nor PPT could approve additional funding; Director of Pupil Services had to be involved). This argument, of course, begs the question of whether agreement at a PPT without a revision of the IEP translates into an enforceable obligation on the part of the district, when the student is not being denied a FAPE. For the reasons outlined above, the Court concludes that the November 4 recommendation did not create such an obligation, and thus the PPT's deferral to Board action did not violate the IDEA.

■ Plaintiffs also argue that the failure to revise the IEP pursuant to the PPT's agreement eviscerated the parental participation requirements of the IDEA, in that the parents were excluded from Dr. Rich's activities in approaching the Board for additional funding. "In the context of the [precursor to IDEA], participation means something more than mere presence; it means being afforded the opportunity to be an equal collaborator, whose views are entitled to as much consideration and weight as those of other members of the team in the formulation and evaluation of their child's education." *V.W. v. Favolise,* 131 F.R.D. 654, 659 (D.Conn.1990). Once again, however, the parental participation requirements do not equate to a mandate for the provision of recommended services, if the services that are otherwise being provided constitute an FAPE. *See, e.g., M.S. v. Bd. of Educ. for the City School District of the City of Yonkers,* 231 F.3d 96, 102 (2d Cir.2000) (rejecting Board's contention that procedural defects cannot invalidate an IEP, because district court had also found that IEP was not reasonably calculated to enable student to receive educational benefits). The parents do not challenge the Hearing Officer's determination that W.A. received such an education, and the record supports that determination.

Further, to the extent a failure to observe the procedural requirements of IDEA can constitute a violation of the statute in its own right, the cases where procedural violations have been so egregious so as to amount to a denial of educational opportunity far exceed the facts alleged in this case. *See, e.g., Briere v. Fair Haven Grade School District,* 948 F.Supp. 1242 (D.Vt.1996) (procedural violations constituted denial of free and appropriate public education where district significantly inhibited meaningful parental participation, where IEP team members told parent that proposed alternative placement would not be discussed, district failed to conduct supplemental evaluation and to advise parent of reasons placement request was refused, district delayed IEP team meetings for 23 months and did not finalize IEP until a subsequent school year, and none of the child's teachers attended IEP team meetings); *Hall,* 774 F.2d at 635 (school consistently failed to inform parents of their procedural rights, availability of public funding for private tutors or educational placement, and right to an independent evaluation of student).

■ The plaintiffs do make reference to 34 C.F.R. § 300.344, and contend that the defendants failed to fulfill their obligations under that regulation "to commit agency resources." Presumably, plaintiffs refer to the defendants failure to revise the IEP pending the Board's decision on Dr. Rich's request to hire an additional teacher. The Appendix to Part 300 of the Code of Federal Regulations does provide some interpretive guidance on the role and responsibilities of the meeting participants, and states that the person selected as the agency representative:

should be able to ensure that whatever services are set out in the IEP will actually be provided and that the IEP will not be vetoed at a higher administrative level within the agency. Thus, the person selected should have the authority to commit agency resources (i.e., to make decisions about the specific special education and related services that the agency will provide to a particular child).

34 C.F.R. Part 300, App. C, N. 13. For this reason, "the IDEA mandates that states cannot avoid their responsibilities under the IDEA by asserting that they lack the resources to provide special education and related services to disabled children." *J.B. v. Killingly,* 990 F.Supp. 57, 77 (D.Conn.1997). In the instant case, however, the addition of a full-time special education teacher was not "set out" in the IEP, nor did the Board "veto" the IEP agreed upon at the PPT. Rather, the Board rejected what the superintendent characterized as a "general request" to "benefit all kids in [the fifth grade] classroom and especially kids with special needs and to assist the teacher." Burgess Test. at 111. Had it been shown that having an additional teacher in the fifth grade classroom was a required part of W.A.'s IEP—that is, necessary for him to receive a FAPE—the Board's failure to implement that IEP by rejecting the proposal to hire a special education teacher might demonstrate a violation of its obligation to commit the necessary resources. This is not such a case, however.

The Court does not mean to suggest that a district may subvert its obligations under the IDEA simply by refusing to revise an IEP, or by allowing the Board to override an agreed-upon IEP based solely upon fiscal concerns. The Court simply agrees with the Hearing Officer that mere consensus at a PPT does not an IEP make, if an otherwise free and appropriate public education is being provided. Reviewing the Hearing Officer's findings under a "modified de novo" standard of review, *see Naugatuck Bd. of Educ. v. Mrs. D.,* 10 F.Supp.2d 170 (D.Conn.1998), the Court will not disregard the Hearing Officer's findings that the PPT participants were motivated by structural and programmatic concerns as well as W.A.'s specific needs, and that the PPT's recommendation for a full-time special education teacher sought to achieve the "best program to make progress up to [W.A.'s] potential," HO Decision at 13, rather than a FAPE. *See Lenn v. Portland Sch. Committee,* 998 F.2d 1083, 1087 (1st Cir.1993) ("the [district] judge is not at liberty either to turn a blind eye to administrative findings or to discard them without sound reason."). The mere fact that consensus was reached at the PPT does not obviate the necessity of inquiring into whether W.A.'s then-current IEP provided a free and appropriate public education, and the Hearing Officer's findings in that regard are well-supported.

### Conclusion

While W.A. no doubt would have received a *better* education had a full-time special education teacher been assigned to the fifth grade classroom, and the Court is sympathetic to the parents' understandable desire to provide such for their child, the defendant here is not obligated to provide the best possible education to W.A. No violations of any specific procedural requirements have been identified, and the PPT recommendation does not create a federal entitlement, when the IEP was not revised. Plaintiff's Objection to Magistrate's Ruling on Cross Motions for Summary Judgment (Doc. # 46) is accordingly OVERRULED. The defendants' motion for summary judgment (Doc. # 24) is GRANTED, and plaintiffs' cross-motion for summary judgment (Doc. # 27) is DE-

NIED. The Clerk is directed to close the case.

IT IS SO ORDERED.