J.W. v. Contoocook                          CV-00-247-M    08/24/01
                    UNITED STATES DISTRICT COURT

                      DISTRICT OF NEW HAMPSHIRE


J.W., by and through his parents
and next friends, K. and M. W.,
     Plaintiffs

     v.                                     Civil No. 00-247-M
                                            Opinion No. 2001 DNH 157
Contoocook Valley School District,
     Defendant


                          O R D E R


     Pursuant to section 1415(i)(2) of the Individuals with

Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 et seq.,

J.W., by his parents, appeals an educational hearing officer's

decision in favor of the Contoocook Valley School District.

Currently before the court are the parties respective decision

memoranda and objections (document nos. 15, 20, 22, & 23), and

plaintiffs' reply to defendant's objection (document no. 31).

Neither party requested a hearing to present additional evidence.


           **Statutory Framework and Standard of Review**

     The IDEA guarantees a free and appropriate public education

("FAPE") to all children.  In return for federal funding, state

educational agencies establish procedures to identify and

evaluate disabled students in need of special education services. 20 U.S.C. §§ 1400(d), 1412. For each identified child, a team is convened, consisting of the child's parents, teachers and a representative of the educational agency ("the Team"). The Team develops an individual education plan ("IEP") for the child. An IEP consists of "a written statement for each child with a disability that is developed, reviewed, and revised in accordance with section 1414(d) of [the IDEA]." 20 U.S.C. § 1401(11); see 20 U.S.C. § 1414(d)(1)(B). An IEP must be "reasonably calculated to enable the child to receive educational benefit," Bd. of Educ. v. Rowley, 458 U.S. 176, 207 (1982), and "custom tailored to address the [disabled] child's 'unique needs,'" Lenn v. Portland Sch. Comm., 998 F.2d 1083, 1086 (1st Cir. 1993) (citing 20 U.S.C. § 1400(c)). IEPs are reviewed at least annually, 20 U.S.C. § 1414(d)(4), and any identified child must be reevaluated at least triennially, id. § 1414(a)(2).

If a parent believes that a proposed IEP will not provide an appropriate education, or that the procedures established by the IDEA have not been properly followed in developing the IEP, he or she may request an administrative due process hearing to review the matter. 20 U.S.C. § 1415. In New Hampshire, only one level

2

of administrative review exists – the due process hearing. If either party is unsatisfied with an administrative hearing officer's ruling, the IDEA permits a civil suit to be brought "in any State court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy" to obtain judicial review of the administrative resolution. 20 U.S.C. § 1415(i)(2). In reviewing an administrative hearing officer's decision,

> the court –
>     (i) shall receive the records of the administrative proceedings;
>     (ii) shall hear additional evidence at the request of a party; and
>     (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropreiate.

20 U.S.C. § 1415(i)(2)(B).

The district court's review under the IDEA has been described as "one of involved oversight." Lenn, 998 F.2d at 1087 (citing Roland M. v. Concord Sch. Comm., 910 F.2d 983, 989 (1st Cir. 1990)). The applicable standard is an intermediate one under which the district court must exercise independent judgment, but, at the same time, accord "due weight" to the administrative proceedings. See Rowley, 458 U.S. at 206; Lenn, 998 F.2d at 1086-87. The exact degree of "due weight" is left to

3

the court's discretion, however, any deviation from the administrative findings should be explained. See Lenn, 998 F.2d at 1087.

District court review is focused on two questions: (1) did the parties comply with IDEA procedures; and (2) is the IEP developed through those procedures reasonably calculated to enable the disabled child to receive educational benefits? See, e.g., Roland M., 910 F.2d 983, 990 (1st Cir. 1990). The burden of proof rests with the party challenging the administrative decision. See Hampton Sch. Dist. v. Dobrowolski, 976 F.2d 48, 54 (1st Cir. 1992) ("The burden of proof at trial was on the school district as the party challenging the hearing officer's decision."); Roland M., 910 F.2d at 991 ("We keep in mind that, in cases arising under the [IDEA], the burden rests with the complaining party to prove that the agency's decision was wrong.").

Failure to comply with every procedural requirement does not automatically render an IEP invalid. If the IEP is substantively appropriate, procedural errors may be overlooked. See Roland M., 910 F.2d at 994 ("Before an IEP is set aside, there must be some rational basis to believe that procedural inadequacies

4

compromised the pupil's right to an appropriate education, seriously hampered the parents' opportunity to participate in the formulation process, or caused a deprivation of educational benefit."). "The ultimate question for a court under the [IDEA] is whether a proposed IEP is adequate and appropriate for a particular child at a given point in time." Id. at 990 (internal quotation marks and citations omitted).

The IDEA does not require that "the benefit conferred . . . [by the IEP] reach the highest attainable level or even the level needed to maximize the child's potential." Lenn, 998 F.2d at 1086; see Rowley, 458 U.S. at 201. Instead, the IDEA "emphasizes an appropriate, rather than an ideal, education; it requires an adequate, rather than an optimal, IEP." Lenn, 998 F.2d at 1086.

### Factual Background[1]

J.W. was born on June 24, 1987. He has been educated in and out of the Contoocook Valley School District ("ConVal") since the spring of 1993, when he was enrolled in kindergarten at

---

[1]The factual background is developed from the parties' Joint Statement of Material Facts, as supplemented from the record where necessary to clarify ambiguities (i.e., school year, date of testing, etc.). Additional record evidence will be identified as needed in the Discussion section.

Peterborough Elementary School ("PES").  J.W. was first identified as a disabled child in need of special educational services in June of 1995, at the end of his first grade year.  He was classified as learning disabled ("LD") due to a discrepancy between his ability and his achievement in the areas of written expression, basic reading skills, and mathematics calculation.[2]  That classification was later expanded to include a speech and language component, and remains J.W.'s classification ("coding") today.  In addition to his current educational disability coding, J.W. has a history of attentional and emotional difficulties, including low self-esteem, poor impulse control, difficulty with transitions, avoidance of responsibility for his behavior, and oppositional-defiant disorder that causes him to react negatively to confrontational situations.

_____

[2]J.W. had previously been referred for an educational evaluation while attending the PES Readiness program during the 1993-94 school year.  A partial evaluation was completed by the end of the 1993-94 school year, and a full evaluation completed during the beginning of J.W.'s first grade year (1994-95).  Both evaluations concluded that although J.W. demonstrated some attention weaknesses, which were more pronounced in formal testing situations, his educational performance was not significantly affected and, therefore, it was unnecessary to identify him as disabled.  J.W.'s parents took issue with those results, but did not pursue any form of appeal.

Following his first grade year, J.W.'s parents removed him from public school, and enrolled him in the Well School, where he completed the second and third grades. The Well School is a small private school in Peterborough, New Hampshire. It is not certified or approved as a special education school. J.W.'s parents also arranged for him to be tutored privately, but did not request special educational services until December of 1996 (third grade), when J.W.'s first IEP was developed. J.W. made little academic progress while attending the Well School.

J.W. returned to ConVal as a fourth grade student at Hancock Elementary School ("Hancock") in the fall of 1997, where he demonstrated progress for the first time. A reevaluation planning meeting was convened on September 9, 1997, at which time J.W.'s parents informed ConVal that J.W. had been diagnosed as suffering from Attention Deficit Disorder ("ADD"). ConVal requested a copy of the report of that diagnosis and agreed to do additional informal assessments and observations.

During his first two months at Hancock, J.W. was evaluated by a ConVal special education teacher and diagnostician who concluded that J.W.'s attention weaknesses were impacting his academic performance, and "strongly recommended that [his]

7

parents seek out a physician trained to diagnose and treat Attention Deficit Disorder." She also recommended maintaining J.W.'s LD code, that consideration be given to adding a speech and language component, and that J.W. be allowed extra time to complete standardized tests. J.W.'s evaluation team adopted those recommendations and prepared an IEP for J.W.'s fourth grade year, which his parents approved on November 18, 1997.

When the team met again on January 29, 1998, K.W., J.W.'s mother, remarked that J.W.'s transition to Hancock had been "OK, but not great," and expressed concern over the amount of time he spent in large groups. School records indicate he was in small groups or receiving one-on-one instruction for reading, writing, and math, and that his teachers reported progress in all areas. J.W.'s parents also informed the team that J.W. would begin taking medication for his ADD, and that they were considering private school for the following school year. At the end of the meeting, the Team agreed J.W. would continue with the IEP approved by his parents in November.

Two weeks later, at K.W.'s request, another meeting was held and J.W.'s parents informed ConVal that because they were concerned about J.W.'s behavior at home, and because they thought

8

J.W. needed more individual instruction, they had decided to re-enroll him at the Well School, which they did the following day. Despite the parents' expressed concerns about individual instruction, a report prepared upon J.W.'s departure indicates that he had progressed in all areas during the six months he was at Hancock, particularly reading and spelling, in which he advanced by approximately a year.

During the summer of 1998, J.W. was hospitalized twice. On July 9, 1998, J.W. was treated at the Cheshire Medical Center ("Cheshire") for suicidal ideation, homicidal threats towards his family and his (then) treating psychiatrist, Dr. Joseph Lebenzon, and verbally abusive behavior. Hospital records reveal that Dr. Lebenzon diagnosed J.W. as suffering from multiple psychiatric disorders.[3] Dr. Lebenzon also identified J.W.'s parents' inability to set and enforce limits as contributing to J.W.'s problems, and interfering with his treatment. J.W.'s mother removed him from the hospital against medical advice on July 16, because she had promised him he could come home after seven days

---

[3] The following clinical diagnoses were listed on J.W.'s discharge report: major depressive disorder; separation anxiety disorder, early onset; generalized anxiety disorder; obsessive compulsive disorder; mathematics disorder; parent-child relational problem; and sibling relational problem.

and was concerned about the effect a broken promise would have on their relationship and his ability to trust her in the future.

Two months later, J.W. was hospitalized a second time. On September 16, 1998, J.W. was admitted to the Charter Behavioral Health System of Brookside in Nashua, New Hampshire ("Charter-Brookside"). By that time, J.W. had stopped seeing Dr. Lebenzon and was being treated by Dr. Robert Kaladish (his current treating psychiatrist). Charter-Brookside records show that J.W.'s second hospitalization was precipitated by a series of events, including: J.W. asking his mother if she wanted him to kill himself; threatening his family; striking his mother with a ski pole; and "accidentally" opening the car door while the car was moving at approximately fifty miles per hour. The records also disclose that J.W. told a physician he had not yet started school that year, on Dr. Kaladish's advice, because he needed time to "get [his] mind off the Cheshire thing and relax." He was discharged from Charter-Brookside on September 23, 1998.

Following his discharge from Charter-Brookside, J.W. was enrolled at the Mountain Shadows School (another small private school) in a fifth grade class with eight other students. The school year was already in progress when J.W. enrolled, and, on

Dr. Kaladish's recommendation, he only attended school part-time. Like the Well School, Mountain Shadows is not certified or approved as a special needs school.

On October 30, 1998, M.W., J.W.'s father, contacted ConVal, raising an issue about J.W.'s coding. Specifically, J.W.'s parents believed he should be identified as seriously emotionally disturbed ("SED"). A new team was convened[4] and, between November 9 and December 14, 1998, three meetings were held to discuss the parents' concerns and to begin investigating the propriety of adding codes. The Team decided additional testing was unnecessary because K.W. said she had reports for five psychological evaluations of J.W. performed during the previous six months, and they did not want to subject J.W. to additional testing. Instead, the Team agreed to review the reports and to have Dr. David Maleski, a ConVal school psychologist, observe J.W. at Mountain Shadows and consult with Dr. Kaladish.

By December 14, the Team was unable to make a decision about J.W.'s coding because Dr. Maleski had been unable to observe J.W. at Mountain Shadows or speak with Dr. Kaladish. J.W. was absent on the two occasions Dr. Maleski attempted to observe him, and

---

[4]J.W.'s elementary school team was no longer appropriate because he was now considered a middle school student.

11

Drs. Maleski and Kaladish could not connect. The team agreed to reconvene after Dr. Maleski had accomplished his two tasks, but, before he could, Mountain Shadows asked J.W. not to return following the winter holidays because they were unable to handle his behavior or address his needs.

On January 11, 1999, J.W. re-enrolled in the ConVal School District as a fifth grader at Great Brook Middle School ("Great Brook"). He was in a class with twenty other students, taught by Janet Pietrovito, a certified special education teacher, who was assisted by a full-time aide, also a state certified teacher. Although a new IEP had not been developed yet due to the need to investigate the coding issue, J.W.'s teacher began implementing classroom modifications to help J.W. focus and feel comfortable in her class. J.W. also met with an after-school tutor.

On January 18, 1999, K.W. sent a letter to ConVal's director of special education describing J.W.'s medical history and other concerns. She stated that she and her husband would be visiting residential schools regarding a possible future placement of J.W. Apparently not aware that Dr. Maleski observed J.W. for an hour in the classroom on January 21, J.W.'s parents sent another letter on January 23, this time to Dr. Maleski, complaining that

J.W.'s evaluation was not proceeding in a timely fashion, and demanding that Great Brook "act without further delay." As of January 23, J.W. had only been in attendance at Great Brook for four days.[5]

The Team met on February 1 and decided not to add an SED code. They agreed J.W. suffered from clinically diagnosed emotional and attention problems that were seen in the classroom but, with the supports in place, those difficulties were not interfering with his educational performance. J.W.'s parents, who were both present at the meeting, concurred in the decision. But, three days later they notified ConVal that they objected to the decision, and sought an appeal while continuing to work with ConVal. They later abandoned the appeal.

The Team revisited the coding issue on March 26 and again declined to add an SED code. Dr. Maleski, who had observed J.W. in class for another hour on March 18, 1999, reported that he still saw no signs of J.W.'s emotional issues interfering with his educational performance. J.W.'s teacher also reported that he was able to work more independently than he had been when he

---

[5]According to attendance records, J.W. was absent one day between January 11 and 23, and school was closed on five days – three for snow days, one for a holiday, and one for a teacher's conference.

13

first arrived at Great Brook, and that when J.W. got upset, he was able to pull himself together if given time to do so. ConVal concluded that J.W. was testing the school's disciplinary system by acting out to see if the prescribed punishment would be imposed. When he realized it would, he generally got himself under control and followed the process. J.W.'s parents signed the evaluation team report demonstrating their approval of the decision.

On March 28, 1999, upon returning from a family ski trip, J.W. had trouble settling down, even after taking his medications. K.W. took him to the emergency room at Monadnock Community Hospital ("Monadnock") after J.W. told her he wanted to kill himself. He was released the same evening with instructions to follow up with Dr. Kaladish the next day at a previously scheduled appointment, and not to miss school. By letter dated March 29, 1999, Dr. Kaladish advised the school that J.W. should be placed on an abbreviated school schedule (no more than four hours a day), and that he needed more support and supervision during unstructured times. The next day, J.W. began attending school only in the morning, returning late in the afternoon two

14

days a week for tutoring. Great Brook staff noticed a marked decline in J.W.'s behavior following the schedule change.

At a team meeting on April 7, concerns about J.W.'s deteriorating behavior were discussed, and M.W. said J.W. would be "back in class next week." J.W.'s IEP for the remainder of the year was discussed and K.W. requested that ConVal provide J.W. with an extended school year ("ESY") or summer school program. She said he would be harmed without one, but there is no evidence about what "harm" she anticipated. J.W. told the team that he did not wish to take part in an ESY program. Determining that, based on academic issues, J.W. had not previously experienced regression over the summer, the team decided ESY programming was unnecessary.

J.W. was suspended for two days on April 9 (a Friday) after he was verbally abusive and physically aggressive towards students and staff, including Great Brook's DARE officer, and destroyed school property. A meeting was set for April 14 (the day J.W. was scheduled to return) to discuss J.W.'s suspension and how to control his behavior, as well as to continue development of an IEP for the remainder of the school year. Dr. Kaladish attended the April 14 meeting and recommended counseling

15

support be added to J.W.'s IEP, to which the Team agreed. A weekly relaxation group was also added at the parents' request, however, ConVal declined to provide a full-time one-to-one aide because J.W. had access to one-to-one help whenever he needed it.

Dr. Kaladish also informed the team that J.W. needed the reduced day because he could tolerate a six hour day but then he would "decompensate" at home. He did not advise the Team that he was concerned about J.W. participating in the school-wide disciplinary system, or his returning to Great Brook, although K.W. said J.W. might enroll in Mountain Shadows the next day. J.W. never returned to Great Brook.

In a letter addressed to J.W.'s parents, dated April 26, 1999, hand delivered to ConVal on April 29, 1999, Dr. Kaladish recommended J.W. not return to Great Brook until further planned evaluations were completed and he was able to review and discuss the clinical implications with "other identified professionals." No reason was given for J.W.'s removal from Great Brook. ConVal also received a written request from plaintiffs' counsel for tutorial services at ConVal expense in the interim.

The same day the letters were hand delivered, ConVal sent J.W.'s parents a proposed IEP which had been developed through

16

the meetings held since February ("the April IEP"). Plaintiffs rejected the April IEP at the next IEP meeting, on May 7, and renewed their request for private tutorial services at ConVal expense. ConVal declined.

At his parents' expense, J.W. began attending David Parker's Tutoring and Instructional Services, Inc., in Concord, New Hampshire ("Parker Tutoring"), in early May of 1999. His attendance at Parker Tutoring was sporadic in May and June of 1999, he was regularly tardy during the first month of the 1999-2000 school year, and he continued to have behavioral problems both at home and at Parker Tutoring. He was removed from a small group setting and worked with a tutor individually in an otherwise empty classroom. Parker Tutoring employs a discipline system based on allowing a child to calm down and then discuss his or her behavior with an adult.

On June 5, J.W. was evaluated by Dr. Harvey Botman, Ph.D., Chief of Assessment Services at Wediko Children's Services in Boston, Massachusetts. Dr. Botman concluded that J.W. demonstrated many of the clinical diagnoses previously identified, in addition to a language based learning disability. He opined that J.W. was eligible for the SED, otherwise health

17

impaired ("OHI"), and multiple handicapped ("MH") codes, and made several recommendations for services. In general, he recommended a "specialized day-program that offers both direct instruction to low-functioning students and intensive therapeutic services to emotionally-disturbed students." Dr. Botman also made specific recommendations that included setting limits, behavior and stress management, preferential seating, help starting assignments, frequent check-ins during individual work, and social training.

The Team received a copy of Dr. Botman's final evaluation at a July 15, 1999, IEP meeting, when J.W.'s 1999-2000 IEP and his parents' renewed request for ESY programming were scheduled to be discussed. Plaintiffs' counsel also renewed the request to reassess J.W.'s coding. His parents wanted an SED code, an OHI code based on J.W.'s ADD, and, due to the proposed additional codings, an MH code. ConVal again found it unnecessary to add the additional codes because, to the extent J.W.'s attention and emotional issues surfaced in the classroom, they were already being adequately addressed, or were not interfering with his educational performance. ESY programming was also denied because "his test scores indicated little to no regression in . . .

18

academic performance over the past year despite inconsistent school attendance."

The parties continued to try to work together to develop an IEP for the upcoming school year. On July 29, plaintiffs' attorney submitted a list of concerns J.W.'s parents had following the previous meeting. ConVal agreed to make some changes to the draft IEP based on the parents' concerns, but recommended a full day of school because members of the Team believed anything less would be insufficient to provide J.W. with the array of services he needed (and his parents requested), and would be inappropriate given the decline in J.W.'s behavior when his school day was previously reduced. ConVal also recommended placement in Great Brook's Alternative Learning Team Program ("ALT Program"), a self-contained, highly structured program, team taught by Deborah Parker (a special education teacher and J.W.'s case worker at Great Brook) and a special education certified aide. The ALT Program incorporates an array of services including life skills, academic and emotional support, peer mediation and conflict resolution, communications skills, and individual attention. J.W.'s parents did not agree to the

proposals but agreed to meet again to continue discussing the IEP and placement.  Another meeting was scheduled for August 6, 1999.

Two days later, ConVal sent J.W.'s parents written prior notice proposing adoption of the draft IEP and recommendations discussed at the July 29 meeting.  J.W.'s parents rejected the proposal through counsel on August 3 and requested a due process hearing to appeal ConVal's refusal to recode J.W. as SED, OHI, and MH, the proposed IEP and placement following J.W.'s April 9 suspension, and ConVal's denial of an ESY program.  The parties continued to try to work things out, requesting several continuances of the due process hearing.  During that time, ConVal received letter-reports from Dr. Kaladish expressing his concerns about the Great Brook programs and placement, as well as his own recommendations.  The letter-reports often arrived indirectly, provided little explanation for the recommendations, and were sometimes in the form of responses to specific hypothetical scenarios posed by plaintiffs' counsel.  J.W. was also evaluated (again) by another psychologist, Dr. Melissa Farrall, who found J.W. demonstrated a significant speech-language impairment and recommended many of the same services as Dr. Botman.

At the hearing officer's request, a final IEP and placement meeting was held on October 25, 1999. ConVal presented an IEP substantially similar to the IEP proposed in July ("October IEP"), incorporating many of Dr. Botman's recommendations, and recommending a full day in the Great Brook ALT Program. J.W.'s parents' rejected this proposal. A due process hearing was held over four days in November of 1999 to address the following issues:

> (1) Whether J.W. should be coded OH, SED, and MH, in addition to the current specific learning disability and speech language impaired codes;
>
> (2) Whether the April IEP was appropriate;
>
> (3) Whether the October IEP was appropriate;
>
> (4) Whether J.W.'s placement in ConVal's ALT Program at Great Brook would provide J.W. with an appropriate education in the least restrictive environment; and
>
> (5) Whether ConVal was correct in deciding J.W. did not require ESY programming.

Parker Tutoring is J.W.'s current educational placement. As of the November 1999 hearing, J.W. was attending the Parker Tutoring Program for three hours a day. He also participates in an outdoor self-esteem program. After a transition period, J.W. is showing progress at Parker Tutoring and at home. His father testified that he and his wife have been enforcing a behavioral

program at home that allows a cooling-off period and focuses on discussing consequences and possible causes of behavior. He also testified that he has learned to be less confrontational with J.W. in reaction to inappropriate behavior.

The hearing officer's final order issued on January 24, 2000. The order included findings of fact, credibility determinations, and conclusions of law ("Final Order"). She found all of ConVal's witnesses credible on issues relevant to her decision. See Final Order at 31-32. While acknowledging Dr. Kaladish's concern for J.W., and crediting his clinical diagnoses, the hearing officer gave "little credence to his testimony regarding the appropriateness of the Great Brook School program, the Mountain Shadows School or David Parker's program[.]" Id. at 32-33. Her credibility finding was based on the fact that Dr. Kaladish never visited any of the programs, admittedly knew nothing about the ALT Program, appeared to be trying "to keep the door open for possible residential care for [J.W.]," and indicated in clinical notes that the professionals retained by J.W.'s parents "were to work in tandem to provide a united front on [J.W.'s] needs for the purpose of [the] hearing." Id. at 32. The hearing officer also found that Dr. Kaladish's

22

"testimony that he was alarmed at the level of counseling services offered by [ConVal] as being grossly inadequate is discredited as there is no persuasive evidence that he suggested to the IEP team on either occasion . . . he met with them, that [J.W.] needed more." Id. She also noted her belief in ConVal testimony that Dr. Kaladish was adversarial during the IEP meetings, "seeking to blame the school for [J.W.'s] problems." Id.

The hearing officer also discredited the testimony of K.W. and M.W., concluding that although they were both acting in what they perceived to be the best interests of their son, they "to some extent have 'set up' [ConVal] in an effort to get public funding for a private need." Final Order at 33. She also found K.W. unable to directly answer any question, and thus of little help. Id.

The hearing officer's twelve separate conclusions of law were all in ConVal's favor. While she did find that some of the IEP goals were not measurable, nor properly linked to the general curriculum, she concluded that there was no substantive violation because "these inadequacies have not and will not compromise [J.W.'s] right to an appropriate education, seriously hampered

23

Parents' opportunity to participate in the formulation process, or caused a deprivation of educational benefits." Final Order at 35. She also found that the October IEP[6] adequately addressed J.W.'s needs, including his emotional and attention issues, that Great Brook's ALT Program was capable of providing the necessary services, and ESY programming was not necessary. Because she concluded the April and October IEPs were appropriate, she denied plaintiffs' request for reimbursement for J.W.'s private placements.

## Discussion

Plaintiffs characterize the dispute between the parties as essentially medical — i.e., J.W.'s inability to respond to the IEPs and proposed placement — and contend the hearing officer improperly discredited Dr. Kaladish's medical opinions. Their complaints fall into six areas: (1) coding; (2) credibility; (3) propriety of Great Brook's disciplinary system; (4) potential harm to J.W. occasioned by the proposed placement; (5) ESY

---

[6]Plaintiffs' challenges to the April IEP were limited to the goals and description of how J.W.'s needs related to the general curriculum.

24

programming; and (6) reimbursement for J.W.'s private placements since leaving Great Brook.

Coding

Plaintiffs contend the hearing officer erred in finding "LD with a speech-language component" to be J.W.'s primary educational disability, and in declining to identify him as SED, OHI, and/or MH. The plea for additional codes stems from plaintiffs' disagreement with ConVal regarding the role J.W.'s emotional and attention problems play in his learning process. The hearing officer agreed with ConVal that although J.W.'s emotional and attention problems did manifest themselves in school, they were not interfering with his ability to learn. Accordingly, she ruled that J.W. did not qualify for the desired codes. David Parker's testimony and Dr. Farrall's evaluation both support her conclusion.

More importantly, however, the hearing officer found "the 'code war' to be unhelpful. If there were components of [J.W.'s] IEP that Parents could demonstrate do not exist and would not exist but for the code, this debate would have more meaning."

Final Order at 41.  The court agrees completely with the hearing officer's determination.

The IDEA does not "require[] that children be classified by their disability so long as each child who has a disability listed in section 1401 of this title and who, by reason of that disability, needs special education and related services is regarded as a child with a disability under [the IDEA]."[7]  20 U.S.C. § 1412(3)(B); see Heather S. v. Wisconsin, 125 F.3d 1045, 1055 (7th Cir. 1997) ("The IDEA charges the school with developing an appropriate education, not with coming up with a proper label with which to describe [the child's] multiple disabilities"); 34 C.F.R. § 300.125(d) (restating 20 U.S.C. § 1412(3)(B)).  There is no question that J.W. is "regarded as a child with a disability under [the IDEA]," and everybody (including plaintiffs' evaluators and David Parker) agrees that

---

[7]Parenthetically, state law establishes a duty to report the "number of students in each disability category," apparently implicating some need to "classify children by their disability." See N.H. Rev. Stat. Ann. (RSA) ch. 186-C:3-a(II-a).  Plaintiffs do not address that duty, and, in any event, there is no evidence to suggest that that administrative requirement has any bearing on the propriety of the IEPs proposed for J.W., or that plaintiffs would have standing to raise any related claim. Accordingly, the state's potential administrative duty does not affect this court's analysis of the issues presented.

he has a specific learning disability with a speech and language component.

So, the real question is not whether J.W. is eligible for SED, OHI, and/or MD codes, but whether his emotional and attention problems cause learning difficulties, requiring services not being delivered by or not available in ConVal, thus constituting unique needs not addressed by the IEPs. See Town of Burlington v. Dept. of Educ., 736 F.2d 773, 793 (1st Cir. 1984), aff'd by 471 U.S. 359 (1985) (requiring understanding of nature of learning difficulties); see also Roland M., 910 F.2d at 993. (noting that real question is adequacy, not procedure).[8]

---

[8] Plaintiffs suggest that ConVal should have adopted Dr. Botman's conclusion that J.W. was eligible for SED, OHI, and MD codes because ConVal "did not perform their own evaluations." Plaintiffs' argument ignores the process and requirements dictated by both the IDEA and the relevant state regulations. In addition to evaluations like the formal tests performed by Dr. Botman, the IDEA requires review of "current classroom-based assessments and observations, and teacher and related services providers observation." See 20 U.S.C. 1414(c)(1)(A). Moreover, while Dr. Botman was qualified to conduct the tests, he was not part of J.W.'s Team and, therefore, not the proper party to determine whether J.W.'s emotional and attention problems constitute educational disabilities. See N.H. Code Admin. R. Ed 1107.05(d) ("Qualified examiners shall not determine the educational disability of any student. Determination of educational disabilities shall be made only by the special education evaluation team." (emphasis added)).

The hearing officer ruled that J.W.'s emotional and attention problems are unique needs, even if they do not rise to the level of educational disabilities. But, she also found that the classroom modifications outlined in the April and October IEPs implicitly recognize that J.W. needs more attention and positive support than some children, as well as specific attention to behavioral and stress management. The record amply supports the hearing officer's findings.

Plaintiffs also say, however, that the proposed IEPs are not enough because, due to J.W.'s emotional and attention problems, Great Brook's disciplinary system, a full day of school, and the ALT Program at Great Brook, are inappropriate. Each of these issues will be discussed in turn. However, because plaintiffs' arguments are almost completely dependant upon Dr. Kaladish's testimony, and, to some extent the parents', the credibility issue must be addressed first.

Credibility

A district court should give due weight to a hearing officer's credibility findings "unless the non-testimonial, extrinsic evidence in the record would justify a contrary

conclusion or unless the record read in its entirety would compel a contrary conclusion." See Carlisle Area Sch. v. Scott P., 62 F.3d 520, 529-30 (3d Cir. 1995). Neither situation is present in this case.

1. Dr. Kaladish

Plaintiffs accuse the hearing officer of "disregard[ing] Dr. Kaladish's clinical findings and recommendation about his patient and mak[ing] different clinical findings." See J.W.'s decision memorandum at 14. They claim "[t]here is no other, current medical or psychiatric testimony in the record but Dr. Kaladish's. His opinions find support in the psychiatric and psychological records. They are entitled to more weight than was given them by the hearing officer." Id.

Plaintiffs are incorrect. The hearing officer plainly did not "disregard Dr. Kaladish's clinical findings." In fact, she, like ConVal, wholly accepted his clinical findings regarding the existence and nature of J.W.'s emotional disorders. See Final Order at 32. She "[gave] little credence to his testimony regarding the appropriateness of the Great Brook School program, the Mountain Shadows School, or David Parker's program," because

29

she determined that his testimony was influenced by inappropriate factors, including a desire to "keep the door open for residential care" and to "present a united front." She also accepted the testimony of ConVal witnesses that Dr. Kaladish seemed to assume the role of advocacy, seeking to blame ConVal for J.W.'s problems, and found Dr. Kaladish's opinions to be inadequately supported because he never observed J.W. at Great Brook, never discussed J.W.'s performance or behavior with Great Brook personnel who actually observed it, and was uninformed regarding J.W.'s programs and the supports in place for him. In other words, she "disregarded" his opinions concerning appropriate ways to address J.W.'s educational problems, not his medical opinions regarding J.W.'s medical problems. Neither the hearing transcript nor the six binders of exhibits, support plaintiffs' challenge; the court accepts the hearing officer's credibility findings.

Plaintiffs characterize Dr. Kaladish's opinions as "medical evidence," and heavily rely on it because they view J.W.'s problems as primarily medical. Dr. Kaladish is a psychiatrist, and therefore qualifies as a medical expert. But, plaintiffs' reliance on the absence of any competing medical or psychiatric

<u>testimony</u> is unpersuasive. Although plaintiffs are correct that no other medical doctor testified at the hearing, and that there is no medical evidence to contradict Dr. Kaladish since the March 28 Monadnock emergency room visit, earlier medical evidence exists in the form of another psychiatrist's opinion contained in hospital records. <u>See</u> Fed. R. Evid. 803(6) (allowing medical records, including opinions, to be admitted as evidence). Furthermore, the record is replete with observational evidence by J.W.'s teacher, the Great Brook principal, and the ConVal school psychologist (all of whom have extensive professional experience in serving educationally disabled children), all of which supports different opinions than those held by Dr. Kaladish. Moreover, as the hearing officer noted, the educational recommendations of plaintiffs' independent evaluators, Drs. Botman and Farrall, are consistent with the proposed IEPs.

In the end, as discussed <u>infra</u>, in most of the relevant areas, the evidence, both medical and nonmedical, substantially contradicts Dr. Kaladish's testimony. All of these factors, in addition to the fact that the hearing officer had a better vantage point, and particular expertise, counsel against

31

upsetting her decision to afford Dr. Kaladish's testimony, beyond his clinical diagnoses, little weight.

2. K.W. & M.W.

The testimony of K.W. and M.W. is likewise problematic. The hearing officer described K.W. as being unable to directly answer questions, and the record supports that conclusion. There can be little doubt that J.W.'s parents have always vigorously pursued the best possible education and medical treatment for J.W., which is admirable. But the IDEA does not guarantee the best possible education; it guarantees an appropriate education. See Lenn, 998 F.2d at 1086. ConVal's educational proposals fit well within the IDEA's mandate.

Propriety of the Disciplinary System

Great Brook's school-wide disciplinary system employs a "positive approach" in addressing inappropriate behavior. A misbehaving child is first given a warning; if the behavior continues, the child completes a "think sheet" in the classroom; and if the behavior still continues, regardless of the severity, the child is sent to the principal's office to complete a "pink

sheet." The child is required to discuss the reasons for his behavior, the impact of the behavior on himself and others, and means by which inappropriate behavior might be controlled in the future.

The system also incorporates the value of praise. If a child does something commendable, he is sent to the principal's office to receive a "white card," which can be entered into a drawing for student of the week.

Relying on Dr. Kaladish, plaintiffs argue that the school-wide discipline system, explicitly incorporated in the October IEP, is inappropriate for J.W. The hearing officer dismissed plaintiffs' complaint since it challenged the choice of methodology for controlling behavior, noting that "[t]he fact that they do not reflect Parents' wishes, does not make them improper," so long as the child was provided a FAPE. Final Order at 47; see Lenn, 998 F.2d at 1091. She rejected the notion that ConVal's disciplinary system operated to deny a free and appropriate education to J.W., finding that plaintiffs' position "seemed to strictly rely on numbers . . . rather than reviewing (1) the underpinnings of the disciplinary program (2) the specifics of each incident and (3) the overall effectiveness of

33

the method." Final Order at 48. The hearing officer's conclusions are also supported by: Dr. Botman's recommendation that a behavior management program be included in any IEP for J.W. that incorporated "self-talk" and understanding the precursors and consequences of behavior; M.W.'s testimony that J.W.'s behavior improved through a similar program used at home; David Parker's testimony describing a similar disciplinary process used at Parker Tutoring; and Great Brook's observations that J.W. was responding to the program before his schedule was reduced. J.W.'s written responses on the pink slips support ConVal's observations, and further undermine plaintiffs' position that the process employed would undermine J.W.'s ability to benefit from the education provided. Accordingly, the court finds the hearing officer's determination that Great Brook's disciplinary system is appropriate for J.W. to be fully supported by the record and not subject to modification.

Potential Harm of Recommended Placement

ConVal recommended that J.W. attend school for a full day under both IEPs. In the October IEP, ConVal recommended that J.W. participate in the ALT Program. Plaintiffs contend both of

34

those recommendations are potentially harmful to J.W. and, thus, constitute inappropriate placements.

### 1. Full School Day

Plaintiffs claim J.W. cannot attend a full day of school due to his emotional difficulties – the related stress apparently causes him to "decompensate" at home. The hearing officer relieved ConVal of any responsibility for J.W.'s behavior at home that did not have a corresponding infraction at school. Plaintiffs object to that approach, but, their objection is based on a faulty premise. In their complaint, plaintiffs alleged "[t]hat the Hearing Officer erred, as a matter of law, when she concluded that the School District was not legally responsible, under the IDEA, for the effect the School District's educational programs and placements would have on J.W.'s emotional well being and/or his emotional functioning in his home or outside of school." Complaint at 15-16. The hearing officer did not make such a finding. On the contrary, while she did find that ConVal was not legally responsible for J.W.'s behavior at home, see Final Order at 57, she also stated, in connection with a related issue, that she was "unpersuaded that the nature of the public

35

school offerings in any way exacerbated [J.W.'s] emotional problems," see id. at 61. The record supports the hearing officer's decision.

J.W.'s history of violent, out-of-control behavior at home predates his enrollment at Great Brook, including while he was attending Mountain Shadows on a reduced schedule and during summer vacation (his hospitalizations at Cheshire and Charter-Brookside were based on out-of-control behavior which occurred during summer vacation). Everyone who actually observed J.W. while he was attending Great Brook on a full-time basis testified that his behavioral problems were minor, and that he was improving. It was when his day was reduced that he became much more difficult to manage at school, leading eventually to a suspension after he became violent. And, after leaving Great Brook, J.W. continued to demonstrate violent, uncontrollable behavior, even at Parker Tutoring, where he had to be separated from the rest of the children. Plaintiffs' statement that "[t]he kind of behaviors J.W. exhibited, at school on April 9, 1999, when he assaulted a student, destroyed school property and was physically aggressive towards the DARE officer, was similar to the out-of-control, or as Dr. Kaladish described, the

36

decompensating behaviors, the parents witnessed at home," J.W.'s Objection to Defendant's Memorandum at 11 n.3, is inconsistent with the proffered theory that the home behavior was caused by the stress of a full day of school. Under plaintiffs' theory, J.W.'s behavior should have improved when his school day was shortened. Plaintiffs offer no explanation for J.W.'s generally worse behavior after his school day was shortened. In any event, the record fully supports the hearing officer's finding that a full day of school is appropriate for J.W.

2. Great Brook's ALT Program

Plaintiffs do not challenge the hearing officer's finding that the ALT Program is capable of providing the services required by the October IEP. Instead, they claim it is potentially harmful to J.W. because it separates him from his peers, and because J.W. equates Great Brook with failure after his suspension. Plaintiffs allege J.W. is hostile toward Great Brook, rendering any program there inappropriate.

The IDEA requires state educational agencies to place children with disabilities in the least restrictive environment

("LRE"). See 20 U.S.C. § 1412(a)(5)(A).[9]  But, "[u]nless the IEP of a child with a disability requires some other arrangement, the child is educated in the school that he or she would attend if nondisabled."  34 C.F.R. § 300.552(c); accord N.H. Code Admin. R. Ed 1115.06(b) (state version).  Preference is also given to placing disabled children in a classroom with non-disabled children, often referred to as a "mainstream" classroom.  See id. A child's fear or hostility towards a particular placement can render the placement inadequate if it is sufficiently severe to interfere with the child's ability to receive educational benefits.  See, e.g., Greenbush Sch. Comm. v. Mr. and Mrs. K., 949 F. Supp. 934, 942-43 (D. Me. 1996).  Moreover, "[i]n selecting the LRE, consideration is given to any potential harmful effect on the child or on the quality of services that he

_____

[9]20 U.S.C. 1412(a)(5)(A) provides:

> To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

38

or she needs." 34 C.F.R. § 300.552(d); accord N.H. Code Admin. R. Ed 1115.06(c) (state version).

Great Brook is J.W.'s neighborhood school. So, unless J.W. "requires some other arrangement," see 34 C.F.R. § 300.552(c) (emphasis added), he should be educated there. ConVal initially recommended J.W. continue in a mainstream classroom because he previously demonstrated progress in that setting, and it would provide more opportunities to develop peer relationships, a specific concern of plaintiffs. But, acquiescing in plaintiffs' desire for more individual attention and smaller class size, the Team recommended J.W. be placed in the ALT Program.

The allegation that J.W. would be "harmed" by attending Great Brook and being separated from his peers is primarily supported by Dr. Kaladish. The hearing officer did not find his opinions with regard to appropriate educational placement credible. She, therefore, did not directly address the likelihood of "harm." For reasons already discussed, the court accepts the hearing officer's credibility finding. Moreover, specific to this issue, Dr. Kaladish's claim that J.W.'s anxieties are so severe that he will likely suffer harm if separated from peers is, again, substantially undermined by

39

plaintiffs' other arguments.  For example, plaintiffs urge the court to find Parker Tutoring an appropriate placement for J.W., yet he was also separated from his peers at Parker Tutoring – for out-of-control behavior.  At least in the ALT Program, J.W. would be able to interact with other children in the program, with mainstreaming readily available as and when appropriate.

The hearing officer's finding that the placement proposals were appropriate for J.W. is supported by the record and affirmed.


ESY

Finally, plaintiffs object to ConVal's denial of an extended school year for J.W., claiming that ConVal applied an incorrect standard when it considered academic issues alone.  They also assert that the hearing officer erred in "[upholding] the District's reliance on 'academic regression' as the sole criterion for measuring J.W.'s entitlement to an extended school year."  See J.W.'s objection to the School District's decision memorandum ¶ 1, at 2-3 (emphasis in original).

It does not appear that plaintiffs objected to ConVal's reliance on an academic standard in denying extended school year

services at the administrative level.  ConVal says in its decision memorandum that plaintiffs "base[d] their argument for extended year services, at the administrative level, on the simple fact that J.W. is behind his academic peers."  Defendants' Decision Memorandum at 22.  Plaintiffs have not disputed ConVal's characterization of their prior position.  Parenthetically, being academically behind is not a valid basis for requiring a school district to provide ESY programming.  See N.H. Code Admin. Ed 1111.01.  The documents submitted at the administrative level and the hearing officer's decision support the conclusion that plaintiffs did not object to ConVal's reliance on academics in denying ESY programming.  Plaintiffs cannot argue here that ConVal relied on incorrect or unduly limited factors in denying extended school year services if they did not first do so at the administrative level.  See David D. v. Dartmouth Sch. Comm., 775 F.2d 411, 424 (1st Cir. 1985) ("[W]e have previously held that for issues to be preserved for judicial review they must first be presented to the administrative hearing officer."); Valerie J. v. Derry Co-op. Sch. Dist., 771 F. Supp. 483, 488 (D.N.H. 1991) (citing David D.).

41

In any event, plaintiffs have failed to meet their burden of showing that J.W. would be entitled to an ESY program if other appropriate factors had been, or are considered now.  See Dobrowolski, 976 F.2d at 54 (placing burden of proof in judicial review on party challenging administrative ruling); Roland M., 910 F.2d at 991 (same).

To be entitled to an ESY program, it must be "demonstrated by a preponderance of evidence that interruption of the student's special education program or educationally related services would have the effect of negating the benefits of the student's standard school year program."  N.H. Code Admin. R. Ed. 1111.01(a) (emphasis added); see RSA 186-C:15.  When determining the duration of an ESY program, the Team must "base its recommendations upon reliable and comprehensive information about the student and the likelihood that the student will suffer harm or regression significant enough to negate the benefits of the student's school year special education program."  N.H. Code Admin. R. Ed. 1111.01(e)(2) (emphasis added).  Other than pointing to a single, conclusory statement by K.W. at the April 7, 1999, team meeting that J.W. "would be harmed without summer support," plaintiffs have made no attempt to show how failure to

42

provide J.W. with summer programming would "have the effect of negating the benefits of [his] standard school year program." Accordingly, there is insufficient evidence from which to conclude J.W. was entitled to ESY programming for the summer of 1999, and, consequently, he is not entitled to compensatory education.

Reimbursement for Private Placement

"[P]arents who unilaterally change their child's placement during the pendency of review proceedings, without consent of the state or local school officials, do so at their own financial risk.  If the courts ultimately determine that the IEP proposed by the school officials was appropriate, the parents would be barred from obtaining reimbursement . . . ." Sch. Comm. of Burlington v. Dept. of Educ., 471 U.S. 359, 373-74 (1985); see Kathleen H. v. Dept. of Educ., 154 F.3d 8, 11 (1st Cir. 1998). Because the April and October IEPs, as well as the recommended placement, were appropriate, plaintiffs are not entitled to reimbursement for unilaterally placing J.W. at Parker Tutoring or in the outdoor self-esteem program.

## Conclusion

For the reasons set forth above, the April and October IEPs and placement in Great Brook's ALT Program were reasonably calculated to enable J.W. to receive educational benefit, and did not pose any meaningful risk of harm to J.W.  Accordingly, the hearing officer's Final Order of January 24, 2000, is affirmed, and plaintiffs' request for reimbursement and compensatory education is denied.


**SO ORDERED.**


                                             _____
                                             Steven J. McAuliffe
                                             United States District Judge

August 24, 2001

cc:  Michael R. Chamberlain, Esq.
     Grant C. Rees, Esq.